## CORTEZ v. FORD MOTOR COMPANY.

1. WORDS AND PHRASES—SENIORITY—LABOR RELATIONS.

Seniority, as used in action of assumpsit against employer and union involved in collective bargaining agreements relative to continued employment, is defined as a system for the laying off and rehiring of employees, based generally upon original date of employment by the company concerned, a concept of job protection unknown to the common law and not founded upon statute law in this State.

2. LABOR RELATIONS—CONTRACTS—SENIORITY.

Seniority rights that are the creation of union-management contracts wherein they are described may be enforced only in accordance with the terms of such contracts.

3. SAME—COURTS—INDUSTRIAL DISPUTES.

Courts are reluctant to assume the role of umpire in industrial disputes when adequate machinery exists within the industry for such purpose.

4. APPEAL AND ERROR—PLEADING—MOTION TO DISMISS.

All well-pleaded facts in a declaration are accepted as true for the purpose of review on appeal from an order granting defendants' motions to dismiss.

5. LABOR RELATIONS—GRIEVANCES—AUTHORIZED REPRESENTATIVES OF UNION.

The proper exercise of the discretion, vested by a union-management contract to receive, pass upon and withdraw grievances presented by individual employees and the interpretation of contract terms in the interest of all of its members is vested in authorized representatives of the union, subject to challenge

REFERENCES FOR POINTS IN HEADNOTES
[2] 31 Am Jur, Labor § 112.
[3] 31 Am Jur, Labor § 183 et seq.
[4] 3 Am Jur, Appeal and Error § 886.
[5] 31 Am Jur, Labor § 100.
[11, 14] 31 Am Jur, Labor § 113 et seq.
[13] 11 Am Jur, Conspiracy § 45.

in the courts after exhaustion of grievance procedure only on grounds of bad faith, arbitrary action or fraud and does not constitute an obligation of the union to espouse and support the individual employee's contention at all times.

6. SAME—NEGOTIATION OF GRIEVANCES.

Any authority to negotiate grievances conferred by a union-management contract, derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the entire membership of the parties represented and the complete satisfaction of all who are represented is hardly to be expected.

7. SAME—NEGOTIATION OF GRIEVANCES.

The discretion vested in a union negotiator under union-management contract, insofar as it relates to grievance procedure is not interpreted as an unqualified undertaking to represent the individual employee's point of view regardless of the interests of the entire membership.

8. SAME—THIRD-PARTY BENEFICIARY CONTRACTS—NEGOTIATION OF GRIEVANCES—SENIORITY RIGHTS.

Plaintiff women who were laid off from defendant employer's stamping plant in which most of the jobs involve the handling of various objects above the lawful maximum permissible for women employees *held,* to have failed to have stated a cause of action against the defendant unions under the third-party beneficiary statute, where it is admitted the union representatives received and considered plaintiffs' grievances relative to seniority rights at great length thereby complying with their obligation of fair representation as imposed upon such defendants by the union-management contract by which the seniority rights were created (CL 1948, §§ 691.541, 691.542).

9. SAME—UNION'S DUTY OF FAIR REPRESENTATION OF MEMBERS.

A union's duty of fair representation under a union-management contract is founded upon the relationship between the union and the members as recited in the constitution and bylaws of the organization or by State and Federal labor statutes, and may be enforced by the individual members by legal action under certain circumstances, but such enforcement is not involved in an action of assumpsit to recover wages alleged to have been lost by reason of failure of union representatives to espouse plaintiff employees' claims as to seniority rights during layoff and rehiring of stamping plant employees (29 USCA, § 158; CL 1948, § 423.8; CLS 1954, § 423.16).

10. SAME—SENIORITY—THIRD-PARTY BENEFICIARY STATUTE—GRIEV-
ANCE PROCEDURE.

> Promises of employer pertaining to seniority, obviously made
> for the benefit of all employees of the company, including
> plaintiff women employees of stamping plant who claimed they
> were laid off and not rehired in violation of pertinent pro-
> visions in union-management contract are limited by the limi-
> tations contained in the contract by virtue of which the rights
> came into existence and where the contract provided for use
> of grievance procedure in the event of dispute and the em-
> ployees did not resort to the use of such procedure in the
> manner prescribed, the employees would have no right of
> action against the employer under the third-party beneficiary
> contract act (CL 1948, § 691.543).

11. SAME—LAYOFF AND RECALL—SENIORITY—ABILITY—THIRD-PARTY
BENEFICIARY—UNION-MANAGEMENT CONTRACT.

> The express language of a union-management contract relative
> to order of layoff and recall of employees involving, primarily,
> seniority, and, secondarily, ability, with disputes involving
> variations from strict seniority subject to determination
> through the grievance procedure provided in the contract is
> not to be supplanted by a court judgment, (1) where such
> procedure was not exhausted to a final decision as provided
> by the contract which gave rise to provisions for plaintiffs'
> benefit but subject to limitations therein contained nor (2)
> where such procedure has been exhausted unless there was
> fraud or bad faith in their conduct, hence, plaintiff employees
> who had failed to establish a right of action in either instance
> had no right of action under the contract as a third-party
> beneficiary thereunder (CL 1948, § 691.543).

12. ACTION—ASSUMPSIT—CONSPIRACY.

> Acts of defendant employer and labor unions under union-
> management contract which were complained of by plaintiffs
> but which are insufficient to sustain an action of assumpsit
> against the defendants do not become actionable by the mere
> addition of the word conspiracy.

13. CONSPIRACY—ACTION—PARTIES.

> Conspiracy is not the ground upon which an action of case may
> rest as a civil cause of action does not result from the con-
> spiracy, but from the thing done and the damage flowing from
> it, although the conspiracy may cause individuals to be respon-
> sible, who, but for the conspiracy, would not be responsible.

14. LABOR RELATIONS—ACTION—SENIORITY.

    Acts of defendant employer, unions and president in conferring and deciding seniority issue unfavorably to plaintiff women employees were not only not illegal in themselves but were specifically authorized by union-management contract which created the rights and the decisions complained of in action of assumpsit and case and were within the discretion of the defendants.

Appeal from Wayne; FitzGerald (Frank), J. Submitted October 11, 1956. (Docket No. 61, Calendar No. 46,972.) Decided July 31, 1957.

Action in assumpsit and trespass by Beatrice E. Cortez, Freda Stinnette and Anne Cooper, as joint assignees of a group of women, against Ford Motor Company, a Delaware corporation, International Union, United Automobile, Aircraft and Agricultural Workers of America (UAW–CIO), and Ford Local No. 600 (UAW–CIO), voluntary unincorporated associations, and Archie Acciacca for damages because of loss of wages through failure to recognize seniority rights. Declaration dismissed on motion. Plaintiffs appeal. Affirmed.

*Dee Edwards* and *A. Albert Sugar,* for plaintiffs.

*William T. Gossett* (*Richard Darragh* and *Joseph A. O'Reilly,* of counsel), for defendant company.

*Harold A. Cranefield, Kurt L. Hanslowe* and *Redmond H. Roche, Jr.,* for defendant unions.

EDWARDS, J. The issues involved herein are of increasing importance to labor, to management, and to millions of individuals whose jobs are governed by seniority provisions in various collective bargaining contracts.

The term "seniority" as used in this case may be defined as a system for the laying off and rehiring of employees, based generally upon original date of employment by the company concerned. It is a concept of job protection unknown to the common law and founded upon no statute law in this State.

Indeed in the period preceding the advent of the union-management contract, employers had the unqualified legal right to lay off or discharge any employee without any regard to original date of hire. Even today, in the absence of contract, or, much more rarely, specific statute, the only legal restriction upon such unqualified rights is found in the unfair labor practice provisions of the national labor relations act and its counterparts in the several States. 29 USCA, § 158; CL 1948, § 423.8, CLS 1954, § 423.16 (Stat Ann 1950 Rev §§ 17.454 [8], 17.454 [17]). See Annotation, "Seniority Rights—Dispute as to—Jurisdiction," 142 ALR 1055.

Since the development of collective bargaining agreements as a method of bringing order out of the chaos of industrial disputes, a good deal of case law dealing with seniority has developed. These cases universally hold that seniority rights, being generally the creation of the union-management contracts wherein they are described, may be enforced only in accordance with the terms of such contracts. *Ryan v. New York Central R. Co.*, 267 Mich 202; *Hartley v. Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees,* 283 Mich 201; *Zdero v. Briggs Manfg. Co.*, 338 Mich 549; *Emmons v. Grand International Brotherhood of Locomotive Engineers*, 340 Mich 368; *Elder v. New York Central R. Co.* (CCA), 152 F2d 361.

The cases likewise illustrate a notable reluctance on the part of the courts to assume the role of umpire in industrial disputes, particularly when adequate machinery exists within the industry for such pur-

pose. *Emmons* v. *Grand International Brotherhood of Locomotive Engineers, supra; Slocum* v. *Delaware, Lackawanna & Western R. Co.,* 339 US 239 (70 S Ct 577, 94 L ed 795).

Our instant proceeding comes to us by appeal from the dismissal of plaintiffs' declaration on defendants' motions by a judge of the Wayne county circuit court. We, of course, accept as true for our review all well-pleaded facts in plaintiffs' declaration. *General Motors Corporation* v. *Attorney General,* 294 Mich 558 (130 ALR 429); *Zdero* v. *Briggs Manfg. Co., supra.*

Plaintiffs are 3 women who sue in their own right and as joint assignees of 105 women employees of the Ford Motor Company. All were employed, at the time of origin of this dispute, in Ford's Dearborn stamping plant. The defendants are the Ford Motor Company, the International Union UAW–CIO, the Ford Local No 600 of said union, and an individual, Archie Acciacca, the president of the Dearborn stamping unit of Ford Local No 600. The individual defendant, the local union and the international union all join in their motion to dismiss, alleging identical grounds. For convenience, they will henceforth be referred to as the union, the defendant Ford Motor Company as the company, and the 108 women as the plaintiffs.

Plaintiffs' declaration in its first count alleges that they were laid off from employment in the company's Dearborn stamping plant during the period from November, 1950, through November, 1951; that male employees of lesser seniority were retained in employment in that unit during the period of their layoffs; that they filed grievances with the union concerning their layoffs, but the union refused to process said grievances; that their layoffs and the refusal of the union to process their grievances violated the

seniority and grievance provisions of the UAW–CIO–Ford Motor Company contract; that they are third-party beneficiaries of said contract; and that they are entitled to damages in the sum of $3,000,000. As a second count, plaintiffs allege a conspiracy between the various defendants to discriminate against them in these layoffs and claim similar damages therefor.

In their motions to dismiss the declaration, both company and union deny that any cause of action is stated in the assumpsit count. Further, they deny that the contract was violated, and they assert that plaintiffs have failed to make use of the grievance procedure set up by the contract. They also assert that no facts are alleged upon which the conspiracy count may be founded.

Plaintiffs set forth in their brief what we assume to be their claimed well-pleaded facts as follows:

"Allegation of Plaintiffs
(other than formal)

"Employment by defendant company.

"Existence of collective agreement of 9/28/49 and 3/16/50 as amended 9/4/50.

"That plaintiffs are third-party beneficiaries.

"That representation of employees, under the contract, is on a 'unit' basis and plaintiffs were represented by Dearborn Stamping unit.

"That local union has no power to modify, amend or interpret.

"That a seniority system based on units, occupational groups and a general labor pool, et cetera, was created by the contract, to govern layoffs, rehiring and transfers.

"That contract forbids discrimination on account of *sex*, et cetera.

"That during the period of Nov. 1950 to Nov. 1951 plaintiffs were laid off and not recalled in breach of their contractual rights of seniority and not to be discriminated against on account of sex; and, further, the company hired new male employees on jobs

to which plaintiffs were entitled, while they were laid off.

"That the layoffs were carried out pursuant to an agreement between defendant company, Local Union 600 and Archie Acciacca as president of the Dearborn Stamping unit to give men preference to jobs held by women and in derogation of their rights thereunder; and that it was part of the agreement that defendant local union and Acciacca would refuse to file grievances arising out of such layoffs.

"Refer to grievance procedure and allege plaintiffs filed grievance with district committeeman, other officers of the unit, Acciacca and the local union, but that these union representatives refused to file these grievances with the company because of the existence of the agreement heretofore referred to; that an appeal was taken to the international union which ruled plaintiffs' layoff illegal and in violation of the seniority provisions of the contract, but did not file a grievance for reinstatement or back pay.

"That plaintiffs were not recalled to work for many months, and some were never recalled and allege loss.

"Count 2:

"That defendants local union and Acciacca entered into an agreement with defendant company to permit the layoff of plaintiffs-appellants in breach of their rights under the collective agreement and to refrain from processing grievances arising from such breach, all contrary to their duty as collective bargaining representatives and under the provisions of the union constitution; that the defendant company induced defendants local union and Acciacca to breach and violate their duties."

The setting for this litigation is given in the company's description of the nature of the work performed in the Dearborn stamping unit (which plaintiffs, in their reply, admit generally, though they allege that there are many jobs in said unit which

females could legally fill, to which plaintiffs were entitled, et cetera):

"That the Dearborn stamping is primarily a heavy stamping plant, producing large body panels, floor pans, fenders, deck lids, roof tops, doors, side assemblies; hoods, et cetera, which weigh in excess of the 35 lbs. maximum permissible for female employees under the Michigan statute and regulations. Most of the jobs in this plant involve handling of these various heavy objects in and out of the presses, handling of gun welders, loading or lifting of stock, hanging stock on overhead conveyors, et cetera, and are entirely unsuitable for the restricted physical capacity and ability of female employees."

To these facts should be added provisions of the contract which is in evidence by stipulation and upon which the parties rely. Twenty-seven pages of the agreement deal with seniority. The most pertinent sections appear to be:

Section 8(b) of article 8:

"The order of layoff and recall shall be governed by first, seniority of employment, and second, ability. The company shall consult with the union before deviating from strict seniority except where prior consultation is rendered impracticable because of a sudden interruption or resumption of work. Should there be any dispute involving the application of this clause, it shall be subject to determination through the grievance procedure."

Section 26 of article 8:

"In the event of a reduction in force other than a temporary layoff, the company shall in preparing the list of employees to be affected by the layoff, have prior consultation with the appropriate union representative where *time permits*. After such consultation and the list of employees to be laid off has been agreed upon, the union shall not contest the accuracy of the list through the grievance procedure unless

the company does not within 3 days make such corrections as might later be suggested by the union. In the event of a dispute as to the proper method of conducting the layoff, the company's method shall be followed and the union may have recourse to the grievance procedure."

Section 7 of article 4:

"The right of the company to lay off and recall employees is limited by sections of this agreement, hereafter provided covering that subject. Notwithstanding those provisions, it is recognized that upon certain occasions it is necessary in order to facilitate tooling, plant arrangement, starting of production or other unusual situations, for the company to retain or to call into work the most capable and efficient employees, out of line of seniority. When such occasions arise the union committeeman will be advised in advance of the number and classifications of such employees. The discretion hereby vested in the company shall not be abused. Complaints that the company has abused its discretion in this respect may be taken up through the grievance procedure provided in this agreement."

Each of the seniority sections refers to the grievance procedure which leads us to another section of the agreement, consisting of 22 printed pages.

The initiation of the grievance is provided for in section 3(a) of article 7:

"An employee having a grievance shall present it in the first instance either to his foreman or to his district committeeman. The district committeeman shall present grievances referred to him to the employee's foreman for negotiations and disposition."

And the grievance (with certain exceptions not pertinent here) moves through various levels of negotiation between company and union representatives until it is submitted to an impartial umpire.

Section 24 of article 7 provides:

"There shall be no appeal from an umpire's decision. It shall be final and binding on the union, its members, the employee or employees involved and the company. The union will discourage any attempt of its members, and will not encourage or cooperate with any of its members in any appeal to any court or labor board from a decision of the umpire, nor will the union or its members by any other means attempt to bring about the settlement of any claim or issue on which the umpire is empowered to rule."

Section 13 of article 7 provides:

"(a) The company shall not be required to pay back wages more than 2 *working* days beyond the date a written grievance is filed."

One other provision of the contract is referred to and relied upon by plaintiffs. Section 5 of article 10 provides:

"The provisions of this contract shall apply to all employees covered by this agreement, without discrimination on account of race, color, national origin, sex, or creed."

Under count 1, the assumpsit count, we are required in passing upon this appeal to answer the following questions:

(1) As to the various defendants against whom suit is brought under this contract by plaintiffs, were the plaintiffs third-party beneficiaries under the Michigan statute?

(2) In the event of affirmative answer to this question, should plaintiffs' cause of action have been dismissed as claimed by the defendants because of limitations in the very contract upon which plaintiffs rely in the grievance procedure sections thereof?

These questions were considered with great care in an opinion by Circuit Judge Frank FitzGerald, much of whose logic and legal reasoning we adopt herein.

To answer the first of these questions, we must first construe the third-party beneficiary statute of the State of Michigan in relation to its effect upon plaintiffs' assertion of rights under agreement between International Union, United Automobile, Aircraft, and Agricultural Implement Workers of America (UAW–CIO) and the Ford Motor Company. The statutory language relied upon is as follows:

"Any person for whose benefit a promise is made by way of contract, as hereinafter defined, shall have the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee." CL 1948, § 691.541 (Stat Ann 1953 Rev § 26.1231).

"A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or to refrain from doing something directly to or for said person." CL 1948, § 691.542 (Stat Ann 1953 Rev § 26.1232).

Plaintiffs' suit is based upon loss of employment due to layoff. There is no claim that the union defendants had or exercised any right to hire, fire, or lay off or rehire any employee at the Ford Motor Company plant concerned. Indeed, the quoted provisions of the contract indicate quite the contrary. No language is pointed to by plaintiffs as contained in the contract which constitutes any specific promise by the union defendants "to give or to do or to refrain from doing something directly to or for said person" in relation to employment. Plaintiffs rely upon the language of section 3(a), article 7, exhibit 1, as constituting an actionable promise. The language follows:

"An employee having a grievance shall present it in the first instance either to his foreman or to his

district committeeman. The district committeeman shall present grievances referred to him to the employee's foreman for negotiations and disposition."

It is their claim that the word "shall" contained in the second sentence above is mandatory, and they further contend in their pleadings that the district committeeman did not present their grievances pertaining to claimed violation of seniority to the employees' foreman for negotiations and disposition.

Plaintiffs' pleadings and the exhibits stipulated in this case make it obvious that the union and its representatives received and considered plaintiffs' grievance at great length and that the general problem with which the grievance was concerned was the subject of extensive negotiation between the union and the company, which negotiations resulted in a number of supplemental memoranda interpreting the application of the seniority provisions of the contract under the reduced working force conditions in the Dearborn stamping plant. These supplemental agreements, constituting 14 typed pages, are contained in the record as exhibits B-1, B-2, B-3, B-4, B-5, B-6, B-7 and B-8. They were executed between the dates of November, 1951, and June, 1952, and pertain entirely to the problem of the application of seniority during the layoffs and rehirings in the Dearborn stamping plant.

Plaintiffs claim that they "made demand upon the defendant local union to file and process the said grievance, but said defendant likewise refused." The duty described in the contract is somewhat different. It recites that the district committeeman shall present grievances referred to him to the employee's foreman for negotiations and disposition. Both plaintiffs' pleadings and the exhibits stipulated as a part of this record make clear that this was done.

The essence of plaintiffs' complaint is really that

the union failed to accept plaintiffs' position upon this grievance, namely, that each of them was, under the seniority provisions of the contract, entitled to a job at all of the times concerned, and failed to urge it upon the company through all the steps in the grievance procedure. There is no promise of this nature contained in the contract. On the contrary, the contract makes amply clear that union representatives have discretion to receive, pass upon and withdraw grievances presented by individual employees.

Our Court has repeatedly held that proper exercise of such discretion over grievances and interpretation of contract terms in the interest of all its members is vested in authorized representatives of the union, subject to challenge after exhaustion of the grievance procedure only on grounds of bad faith, arbitrary action or fraud. *Hartley* v. *Brotherhood of Clerks, supra; Zdero* v. *Briggs Manfg. Co., supra.* The United States supreme court has held the exercise of such discretion authorized by the labor management relations act of 1947 (29 USCA, § 141 *et seq.*). In *Ford Motor Co.* v. *Huffman,* 345 US 330, 337–339 (73 S Ct 681, 97 L ed 1048), the supreme court said:

"Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented. A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals. A bargaining representative, under the national labor relations act, as amended, often is a labor organization but it is not essential that it be such. The employees represented often are members of the labor organization which represents them at the bargaining

table, but it is not essential that they be such. The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. In the instant controversy, International represented, with certain exceptions not material here, all employees at the Louisville works, including both the veterans with, and those without, prior employment by Ford, as well as the employees having no military service. Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

"Compromises on a temporary basis, with a view to long-range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary. See, *e.g., Hartley* v. *Brotherhood of Clerks,* 283 Mich 201; and see, also, Williamson & Harris, Trends in Collective Bargaining (1945), 100–103.

"The national labor relations act, as amended, gives a bargaining representative not only wide responsibility but authority to meet that responsibility."

See, also, *Bianculli* v. *Brooklyn Union Gas Co.,* 115 NYS2d 715; Cox, Rights under a Labor Agreement, 69 Harvard L Rev 601.

The paragraph must be read as a part of the whole contract. The terms "shall present grievances * * * for negotiations and disposition" must be interpreted as containing the discretion to effect compromises and settlements in the interest of all members, referred to in quotation from *Ford Motor Co.* v. *Huffman, supra.* As indicated, we do not believe the paragraph of the contract relied upon by plaintiffs for their assumpsit action against the union warrants the interpretation they have sought for it. It cannot, in our view, be interpreted as an unqualified undertaking to represent these plaintiffs' point of view on their grievance regardless of the interests of the entire membership.

We do not believe under the pleadings and record currently before us that plaintiffs state a cause of action in assumpsit as third-party beneficiaries against the defendant International Union CIO, or Local 600 UAW–CIO, or Archie Acciacca.

In this regard, we are mindful of the fact that individual members of the union may under certain circumstances enforce fair and proper representation of their interests on the part of their union representatives by legal action. The union's duty of fair representation is founded upon the relationship between the union and the members as recited in the constitution and bylaws of the organization, *Ryan* v. *New York Central R. Co., supra; Hartley* v. *Brotherhood of Clerks, supra,* or in the duty imposed upon the union of fair representation by State

or Federal labor statutes. *Steele* v. *Louisville & Nashville R. Co.*, 323 US 192 (65 S Ct 226, 89 L ed 173); *Brotherhood of Railroad Trainmen* v. *Howard*, 343 US 768 (72 S Ct 1022, 96 L ed 1283); *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen*, 338 US 232 (70 S Ct 14, 94 L ed 22).

No such case is before us. Since this count is founded entirely upon assumpsit, the cases which deal with the union's violation of its constitutional obligation to its members, or its obligation under the State and national labor acts, are not in point.

As to plaintiffs' claim that they are third-party beneficiaries in relation to the company's promise of seniority rights as contained in the union-management contract, exhibit 1 in these proceedings, the situation is quite different. The previously-quoted contractual provisions of exhibit 1 do contain promises pertaining to seniority obviously made for the benefit of all employees of the Ford Motor Company, including plaintiffs.

As has been previously stated, however, plaintiffs' seniority rights exist only as a result of exhibit 1. Hence, these rights are limited by the limitations contained in said contract.

In *Zdero* v. *Briggs Manfg. Co.*, 338 Mich 549, 553, this Court stated:

"Seniority rights are not inherent, but exist solely by virtue of a contract, either between the employer and his employees or a union acting in their behalf. These rights are subject to the terms and conditions of the contract, and in this instance their benefits inure through the union to its members. See *Ryan* v. *New York Central R. Co.*, 267 Mich 202."

The principle stated above is stated even more specifically in the third section of the third-party beneficiary statute (CL 1948, § 691.543 [Stat Ann 1953 Rev § 26.1233]):

"The rights of a person for whose benefit a promise has been made, as hereinbefore defined, shall be deemed to have become vested, *subject always to such express or implied conditions, limitations, or infirmities of the contract* to which the rights of the promisee or the promise are subject, without any act or knowledge on his part, the moment the promise becomes legally binding on the promisor, unless there is some stipulation, agreement or understanding in the contract to the contrary." (Italics supplied.)

It is obvious from the contract that the company in yielding some of its undisputed discretion over the hiring and laying off and recall of its employees did so with many limitations and conditions contained in the contract. Section 8(b), article 8, exhibit 1, provided for example:

"The order of layoff and recall shall be governed by first, seniority of employment, and second, ability. The company shall consult with the union before deviating from strict seniority except where prior consultation is rendered impracticable because of a sudden interruption or resumption of work. Should there be any dispute involving the application of this clause, it shall be subject to determination through the grievance procedure."

In each of the paragraphs relative to seniority rights which have been quoted above, reference is made to the determination of the dispute through the grievance procedure; and, as has been noted, a detailed grievance procedure which resulted in ultimate decision on grievances by an impartial umpire, whose decision would be final, was provided.

The contract currently considered provided for layoffs in order of seniority where ability to perform a job was present. It further provided for negotiations between the company and the union in the event of any dispute over the problem of ability.

It further provided a detailed grievance procedure ending in an impartial umpire's final decision, with said procedure made available to employees either through complaint to their union district committeeman or to their foreman. We are now asked to hold that this contractual machinery for settlement of grievances should be supplanted by a court judgment as to whether each individual job in the Dearborn stamping plant was suitable for female employment, and whether each of these individual female employees was able to perform a job then held by a man with lesser seniority.

It is obvious that the contracting parties, by the express language of their contract, did everything humanly possible to agree to avoid such an eventuality. It is likewise obvious that for the courts to undertake such a task would quickly bring the wheels of industry to a standstill, along with the wheels of justice. Under the third-party beneficiary statute, plaintiffs, in seeking to enforce the seniority promises of the company under exhibit 1, are limited by the express provisions of the contract upon which they rely.

Further, although not essential to our decision, the record indicates a failure on the part of plaintiffs to exhaust their contractual remedy before appealing to the courts.

"In general, where a collective agreement provides for an extrajudicial means of hearing and determining disputes growing out of grievances of employees or the interpretation and application of contracts between employer and employee, an employee should exhaust the remedy provided before resorting to the courts. *Anno:* 95 ALR 52." 31 Am Jur, Labor, § 123.

Plaintiffs had access, under the contract, to the steps in the grievance procedure through presenta-

tion of their grievance to the company foreman. There is no allegation that this was done. The circuit judge was correct in dismissing the declaration in its assumpsit count, in the following words:

"Our Supreme Court, in the case of *Leadon* v. *Detroit Lumber Company,* 340 Mich 74, has stated that such failure is fatal to a claim in assumpsit. In denying Leadon's claim, the Supreme Court said (p 78):
" 'If plaintiff is relying upon rights arising out of the contract between the local union, of which he was a member, and the employer, it is enough to say that he never pursued the remedies afforded him under that contract. See *Hartley* v. *Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees,* 283 Mich 201; *Mayo* v. *Great Lakes Greyhound Lines,* 333 Mich 205; *Zdero* v. *Briggs Manufacturing Co.,* 338 Mich 549.'
"Hence, this court must hold that such failure on the part of the plaintiffs herein is fatal to their claim in assumpsit in this court."

Without more being added, we may likewise affirm the circuit judge's dismissal of count 2 of the declaration. The acts complained of above which we have found insufficient to sustain an action in assumpsit do not become actionable by mere addition of the word "conspiracy." On the subject of conspiracy, Judge Learned Hand has said:

"The notion that it is enough vaguely to charge defendants with 'conspiracy,' garnished with such adverbs as 'maliciously' and 'wrongfully,' has done more to bewitch the whole subject than anything else." *Harley & Lund Corporation* v. *Murray Rubber Co.* (CCA), 31 F2d 932, 935.

Our Court has repeatedly stated the same principle:

"Conspiracy is not the ground of these actions on the case. The cause of action does not result from the conspiracy, but from the thing done and the damage flowing from it. Here, it is the fraud and damage. Conspiracy, by reason of the connection it involves among the conspirators, may cause individuals to be responsible, who, but for the conspiracy, would not be responsible at all." *Bush* v. *Sprague,* 51 Mich 41, 48.

See, also, *Ashton Sales, Inc.,* v. *Ashton,* 344 Mich 300; *MacGriff* v. *Van Antwerp,* 327 Mich 200.

The acts of defendants in conferring and deciding the seniority issue unfavorably to plaintiffs were not illegal in themselves. Furthermore, as indicated above, they were specifically authorized by the contract, and the decisions complained of were within the discretion retained by or allotted to the various defendants by the contract.

Under the decision stated above, the issue presented in the cross appeal is moot.

The judgment of the court below is affirmed. Costs to appellees.

DETHMERS, C. J., and SHARPE, SMITH, KELLY, CARR, and BLACK, JJ., concurred.

VOELKER, J., took no part in the decision of this case.