George PEKAR, Joseph Rozell, Edward Patterson, John Audia, Melvin Gower and Robert Schmantowsky, Individually and in Behalf of All Other Employees of Goebel Brewing Company Who Worked at Plant No. 3 of Said Company Prior to the Closing Thereof, Plaintiffs-Appellees,

v.

LOCAL UNION NO. 181 OF the INTERNATIONAL UNION OF UNITED BREWERY, FLOUR, CEREAL, SOFT DRINK AND DISTILLERY WORKERS OF AMERICA, AFL–CIO

and

International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO, Defendants-Appellants.

No. 14818.

United States Court of Appeals
Sixth Circuit.

Dec. 31, 1962.

James C. Paradise, Cincinnati, Ohio
and Winston L. Livingston, Detroit,
Mich., for appellants.

Dee Edwards, Detroit, Mich., for appellees.

Before McALLISTER, Circuit Judge,
and BOYD and TAYLOR, District Judges.

ROBERT L. TAYLOR, District Judge.

Pekar, Rozell, Patterson, Audia, Gower and Schmantowsky, individually and in behalf of all other employees of Goebel Brewing Company who worked at Plant No. 3 of said Company prior to its closing, filed an action under the Declaratory Judgments Act, 28 U.S.C. § 2201, and the National Labor Relations Act, 29 U.S.C. § 157, against Local Unions No. 3, 38 and 181 of the International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL-CIO and the International Union of the brewery industry,[1] praying the Court to enforce their seniority rights under a collective bargaining agreement entered into between the brewers of Detroit, including Goebels and the Locals of the International Union of brewery workers.

Plaintiffs also sought a declaratory judgment determining their rights under the collective bargaining agreement and an injunction against the Unions from refusing to process their grievances with respect to their layoff, or in the alternative a restraining order against the Unions from failing and neglecting to negotiate another agreement with Goebel which will fairly reflect all the rights and claims of all employees to the remaining available jobs at Goebel Brewing Company.

The District Judge issued a declaratory judgment and ordered an injunction as prayed for in the complaint and this appeal followed.

The Company is not a party to the action.

Local No. 3 represents the brewing department employees and Local No. 38

[1] Appellants will sometimes be referred to as Local Union and International Union, respectively, and appellees as plaintiffs and Goebel Brewing Company as the Company.

represents the delivery and freight department employees. The action was dismissed as to Locals 3 and 38 and an order entered against Local Union 181 and appellant International Union only.

Local 181 represents the bottling department employees and checkers.

The Company operated two plants. Prior to 1948, none of the breweries had more than one plant in Detroit. The Company in 1948 purchased a plant of Koppitch-Melchor Company which was a party to the collective bargaining agreement. This plant became known as Goebel's Plant No. 3 and the Company's other Detroit plant as Plant No. 1. They are about a mile and a half apart.

A number of Plant 1 bottling department employees were transferred to Plant 3 in 1948 and 1949. Those employees of Plant 1 who were transferred to Plant 3 were credited with their service with the Company and the former Koppitch-Melchor employees were also credited with their service with that Company for seniority purposes with Goebel. Seniority lists were posted and maintained at Plants 1 and 3 from the date of acquisition of Plant 3 by the Company.

The May 20, 1949 agreement was the first collective bargaining agreement negotiated following the acquisition of Plant 3. It provided that no permanent transfers might be made from one plant to another except on a voluntary basis. The provision applied only to Goebel as no other brewery operated two plants in Detroit. An additional provision required that a list of employees be arranged in the order of their seniority and that such list be posted in a conspicuous place on the premises of the employer and that, after the expiration of 90 days, no changes be made in the seniority list except those necessitated by termination of employment or the addition of employees. Separate lists were always posted in each of the plants without objection, although the contract used "list" in the singular.

The 1949 agreement provided further for strict adherence to seniority in laying off and rehiring, preference of shifts, division of overtime equally among regular employees, and choice of vacation periods in the respective departments based on length of service with the employer. These provisions were always applied separately in each plant.

In December, 1949, negotiations between the Detroit breweries and the Local Unions were carried on concerning a supplemental agreement affecting Local 3, but the Company refused to sign the agreement without assurance that its two plants would continue to be treated separately for seniority purposes.

The Company's Labor Relations Counsel wrote a letter dated December 8, 1949 confirming the understanding of the parties that the contract required the Company to maintain two distinct seniority lists, one for each plant; and that the Company had no right to make transfers from one plant to another except to fill vacancies and no vacancy would be deemed to exist at one plant at any time that men with seniority at such plant were not working, and in making transfers from one plant to the other, the men selected would be taken from the bottom of the seniority list from which transfers were being made. This letter was read to the membership of the Local Union at the following membership meeting.

Seniority and other provisions of the 1949 contract were carried through succeeding contracts without material change, including the 1958 contract, except for the change that was made when the checkers were organized in October, 1950. The Union requested a single company-wide seniority system for the checkers.

An agreement was executed on October 23, 1950 setting out the condition of the Company's recognition of the Local as representative of the checkers. Section 4 thereof provided for one seniority list for both plants covering all checkers, but stated that it should in no way be used as an argument that one seniority list should be established for both plants to cover other employees represented by

the bottlers, brewers, or drivers. The supplemental agreement of October 23, 1950 was reconfirmed and supplemented in May, 1951.

The October 22, 1956 contract provided again for one seniority list for both plants covering checkers. The provision as to checkers was incorporated in the 1958 agreement and was the only specific reference therein to a company-wide seniority list. As a result, the checkers moved from one plant to another.

Only five bottlers moved from one plant to another between 1949 and 1955. These bottlers were moved to Plant 3 in June, 1954. Before moving, they were advised by the Company that there was no transfer of seniority between the two plants and each signed an acknowledgment of his loss of seniority in Plant 1 and went to the foot of the Plant 3 seniority list. No bottler in one plant ever bumped an employee with lesser seniority in the other plant out of a job, or attempted to do so. Plant 3 was shut down for a period of eighteen months commencing in December, 1955, but none of the Plant 3 employees bumped any of the employees in Plant 1 who had less seniority.

Prior to the December, 1955 shutdown, seniority rights of the Plant 3 employees had been discussed at Union meetings. The minutes of the Local Executive Board and shop stewards, including representatives from Plants 1 and 3, held on October 23, 1955, show that it was noted that only the checkers seniority list was company-wide. The minutes were read and accepted by the Local Union on November 6, 1955.

At a regular Executive Board meeting of the Local on December 5, 1955, certain of the Plant 3 representatives discussed with the Board the manner of handling the problems that would arise when Plant 3 was closed. The minutes of the meeting disclosed that it was the consensus of the Plant 3 employees that when employees were hired at Plant 1, the job should be filled by starting from the top of the seniority list of Plant 3.

At the January 3, 1956 meeting of the Local Executive Board, after Plant 3 had closed, a question was raised concerning the application of the contract provision granting superseniority to officers and shop stewards. The minutes show that a motion was adopted that an officer who was a Plant 3 employee should be permitted to exercise his top seniority as an officer of the Union and that he be the first sent to the next job opening at Plant 1; but that because of the dual seniority list, he would be placed at the bottom of the seniority list at Plant 1. The minutes were read and accepted at the January 8, 1956 membership meeting.

On January 20, 1956, in response to a request from the business agent of the Local, the General Counsel of the International gave a legal opinion concerning the seniority rights of the Plant 3 bottlers. He stated that Plant 3 employees could not assert their seniority in Plant 1 if Plant 3 should be permanently closed. He suggested that arbitration be considered. The Local Executive Board decided that arbitration was not required inasmuch as the Company and the Union were in agreement that the contract provided for plant-wide seniority rather than company-wide seniority.

On February 2, 1956, the General Counsel of the International gave another opinion reaffirming his January 20, 1956 view that seniority rights were plant-wide rather than company-wide. This opinion was read at a regular membership meeting on February 5, 1956, in which the membership concurred.

On February 26, 1956, John Audia communicated with the International on behalf of the Plant 3 bottlers who had previously worked in Plant 1, claiming the right to exercise their seniority in Plant 1, and requested consideration of their problem. No rights were claimed for Plant 3 employees who had not previously worked in Plant 1. The President of the International treated the communication as an appeal and wrote the Local Union. The President concurred in the opinion of the International General Counsel that seniority of the employees

was plant-wide and not company-wide. Many of the Plant 3 bottlers who were laid off as a result of the December 15, 1955 shutdown obtained employment in Plant 1, but went to the bottom of the seniority list in that plant as of the date of their employment.

On March 4, 1956, the appeal of the Plant 3 employees to the International was discussed at a membership meeting and it was noted that the membership had previously concurred in the legal opinion received from International Counsel.

The Local Executive Board again considered a problem with respect to seniority rights of Plant 3 employees on August 6, 1956 and reaffirmed its previous decision that the seniority date of a Local Union officer from Plant 3 who was hired in Plant 1 was his date of hire in Plant 1.

The Plant 3 employees during the shutdown from 1955 to 1957 consulted a lawyer about starting suit to establish their claim to company-wide seniority rights. The matter was not pursued because of rumors that Plant 3 was shortly to reopen.

In May, 1957, the Company and Union representatives met to agree upon the procedure for the recall of the Plant 3 employees. It was agreed that Plant 3 employees would be given at least seven days' notice of recall and that those who were working in Plant 1 would have the option of remaining in Plant 1 and utilizing their Plant 3 seniority or returning to Plant 3 and utilizing their Plant 1 seniority.

The Company sent a letter and questionnaire to all Plant 3 bottle shop employees on May 7, 1957 informing them of its intention to reopen Plant 3 and advising them of the principles agreed upon governing their recall. They were advised that employees on the Plant 3 seniority list then working at Plant 1 would be given the opportunity to elect whether to remain at Plant 1 or return to Plant 3. If they elected to remain at Plant 1, they would be dropped from the seniority list at Plant 3. If they elected to return to Plant 3, and should be laid off for a period of 10 successive working days at that plant at any time prior to January 1, 1958, they would have the right to return to Plant 1 with the same seniority that they had at the date they transferred to Plant 3, plus such additional seniority as they may have acquired at Plant 3 after the reopening. It was specifically pointed out that an election to return to Plant 1 at that time would result in their being dropped from the Plant 3 seniority list. It was also pointed out that the Company was not in a position to assure them that Plant 3 would be continued in operation for any specified time; that the question would be determined by Management in the light of future business conditions.

Each of the plaintiffs received the letter and questionnaire and they elected to return to Plant 3 under the conditions set forth in the May 7, 1957 letter and questionnaire. Plant 3 had been modernized during the shutdown and it was the view of the men that Plant 3 would remain open permanently.

The seniority provisions of the various contracts which had been made prior to 1958 were identical to those incorporated in the 1958 contract. Those provisions had been interpreted over the years by the Union and the Company as being plant-wide as distinguished from company-wide and the membership of the Union, including all of the plaintiffs, were familiar with those interpretations.

In November, 1957, the Local Union's Contract Committee began a series of meetings for the purpose of considering contract changes to be submitted to the Company in the forthcoming negotiations as the bargaining agreement then in effect was due to expire in April, 1958. All the plants in Detroit were represented on the Contract Committee. Patterson represented Plant 3.

At the first meeting of the Contract Committee, the question was raised, whether Goebel employees desired to change the seniority provisions of the

contract to provide for company, rather than plant, seniority. The representative of Plant 3 was told that if the employees of Plant 3 wanted to change the seniority provisions that then was the time to try to get it into the contract. It was suggested that a vote of the employees at Plant 1 and Plant 3 be taken as to whether they wanted plant or company seniority. Patterson took up the question of a vote with the members at Plant 3. At a meeting of the group on January 25, 1958, it was decided that a vote would not be fair as there were over 200 employees at Plant 1 and only 80 employees at Plant 3 and that since separate seniority lists had been in practice for ten years, the matter should not be changed.

On October 10, 1958, the Company announced to its employees that it intended to suspend operations at Plant 3. At the same time, there were about 40 Plant 1 employees with seniority rights who were laid off. The number of laid-off Plant 1 employees increased during the winter to a total of 20% to 25% of the Plant 1 working force of about 230.

On June 23, 1960, the Company advised the employees that Plant 3 had been sold and that they were terminated.

Plant 3 bottlers submitted a statement to the Local Executive Board on January 5, 1959 asking the Board to see that they were given the right to replace men with less seniority at Plant 1. In the statement, they stated that they had checked the collective bargaining agreement, but could find nothing in it stating that they had either company or plant seniority. The statement recited that the Company recognized total company service for the purpose of computing vacation periods; that the employees who transferred from Plant 1 to Plant 3 in 1948 and 1949 carried seniority with them; and, the checkers had a company-wide seniority system and the dockmen who were represented by Local 38 also had interplant rights. The Local Executive Board advised Plant 3 employees that it could not grant their request without violating the contract.

The representatives of the Plant 3 bottlers then filed an appeal with the International President. The appeal presented 10 points relied upon by the Plant 3 employees and repeatedly stated that the contract did not define the nature of the seniority of the Goebel employees. The International President requested a statement from the Local of its position in the matter. A statement from the Local was received, a copy of which was sent to the appealing members.

The International President advised the appealing members on February 4, 1959 that the Local Union had correctly interpreted the contract and that there was no reason for the International to interfere. It was pointed out that the 1958 contract was entered into with full knowledge that previous contracts had been construed to apply on a plant-wide basis rather than company-wide basis with respect to seniority rights.

Plaintiffs presented a grievance to the Company in the Spring of 1959 and were granted a hearing. The Company took the position that through the years there were two separate seniority lists and there was no way to help the employees in Plant 3 because the contract had always been interpreted as providing employees seniority on a plant-wide basis.

\* \* \* \* \*

The District Judge found: That Plant 1 and Plant 3 each had its own seniority list and status and that the employees of each plant had plant-wide rather than company-wide seniority for layoff and re-hiring or recall purposes; that seniority lists were posted at Plant 3 and Plant 1 and that the employees on one list could not bump employees for job preference on the other list with the result that in transferring from one plant to the other in either direction, an employee did not carry his seniority to his transferred status, but went to the bottom of the seniority list at the time of such transfer; that checkers had company-wide seniority with Goebel by virtue of special contract agreements; that in October, 1958, the employees at Plant 3 were told

634

that the Company was going to terminate production at that plant and that on that day employees of Plant 3 were told that they could not go to Plant 1 for work even though there were employees of Plant 1 with less seniority than some of the men being laid off at Plant 3; that Plant 3 employees submitted their seniority grievance to Local 181, but obtained no relief, then to the International with the same result; that during the year 1955, when Plant 3 had been shut down for an extended period of time, there was a discussion about seniority with Local Union 181, as to whether the employees at Plant 3 were invested with plant-wide seniority or company-wide seniority; that during this layoff, employees from Plant 3 went to work at Plant 1, but were placed, under protest, at the bottom of the seniority list at Plant 1; that when Plant 3 was reopened, the employees of that plant who were working at Plant 1 were asked if they wanted to remain at Plant 1 or return to Plant 3; that since Plant 3 was modernized during the shutdown, they felt that it would remain open permanently, so they returned to Plant 3 and assumed their Plant 3 seniority; that Section 11 of the 1958 agreement provides that employees shall have preference of shift in accordance with their seniority, but the preference was granted separately in each plant with the result that an employee in Plant 3 could not avail himself of this preference in Plant 1; that the converse was also true.

He further found: That after the layoff in 1955, while Plant 3 was being modernized, the seniority status of the members of Local 181 employed at Plant 3 became a matter of concern and controversy within the Union; that a legal opinion from the General Counsel of the International was forwarded to Mr. Peter Hann, Business Representative and Corresponding Secretary of Local 181, regarding the question of seniority rights of members of Local 181 at Plant 3; that the General Counsel advised that it had never been the intention of the Company or the Union to establish company-wide seniority; that a laid-off employee had no right to bump employees with less seniority at Plant 1 and that the same would be true of an employee of Plant 1 attempting to bump an employee of Plant 3; that he further advised that since seniority was on a plant-to-plant basis a Plant 3 employee who would transfer to Plant 1 would go to the bottom of the seniority list, and the same would be true of a Plant 1 employee transferring to Plant 3; that this opinion was submitted to the general membership of the Local at a meeting held on February 5, 1956 and was discussed by the members and approved.

The Court further found: That in relation to the negotiation of the 1958 agreement, the first meeting of the Contract Proposal Committee was held during the fall of 1957, at which time the seniority rights of the employees of the two Goebel plants were discussed pro and con; that at another meeting of the Contract Committee held on January 25, 1958, the problem of one or two seniority lists of Plants 1 and 3 of Goebel was again brought up and discussed and it was determined that it should be left as is because a vote at that time would not be fair to all concerned since there were over 200 employees at Plant 1 and 80 employees at Plant 3, and that inasmuch as separate seniority lists had been in practice for the past ten years, it was better for the contract to remain unchanged.

He found finally that the proposals agreed upon by the Contract Committee were submitted to the general membership of Local 181 for ratification, then to the Joint Executive Board for endorsement and then to the International Union for its attention; that at the time that proposals were being submitted and considered, it was a matter of common knowledge of the officials of Local 181 that the Plant 3 employees were contending that there was company-wide seniority; that Local 181 never asked or considered asking the Company to do anything about the seniority rights of its employees; that the Local's position was

that the employees of Plant 3 had no seniority rights at Plant 1, and that the Local further felt that it was not its duty to try to reopen the contract to change the seniority rights of the respective parties.

In its conclusions of law, the Court stated that the distinction between plant-wide and company-wide seniority was not spelled out in the agreement of May 22, 1958, but that this fact did not indicate the existence of an ambiguity; that the language in the agreement in its entirety relating to seniority permitted no other interpretation than that of company-wide seniority; that defendants pointed to no provision clearly construable as referring to plant-wide seniority and that the implications to be drawn from the language of the contracts were entirely consistent with company-wide seniority.

The Court further concluded that whether or not defendants deliberately discriminated against, or intended to discriminate against, the plaintiffs was immaterial for purposes of the resultant effect upon plaintiffs; that defendants breached their duty of fair representation which resulted in a type of injury to plaintiffs against which they were entitled to have been protected by virtue of the terms of the bargaining agreement; that the fact that the plaintiffs made no complaints prior to 1955 is no reason for their having been precluded from attempting to assert the rights to which they were entitled under the bargaining agreement; that the various situations which arose in relation to seniority rights were of such a nature that it would have served no practical purpose for plaintiffs to have raised the issue of company-wide seniority versus plant-wide seniority and that their non-insistence did not waive or release their contract right to company-wide seniority, and further that there was no intention upon the part of plaintiffs to do so.

The District Court concluded finally that discrimination was practiced upon plaintiffs by defendants, regardless of intent on the part of the defendants; that they have suffered ultimate discrimination just as much by the allegedly good intentions of the defendants as they would have had the defendants acted willfully and maliciously; that plaintiffs had a right, and a continuing one, to rely upon the terms of the agreement since there was no valid modification of said agreement with respect to issues here raised, plaintiffs were entitled to recognition of company-wide seniority; that the contract, being clear, reliance upon acts and conduct in construction thereof is unnecessary and improper.

The District Judge noted that the contract provided that "No verbal understanding or representations of any nature that would change the meaning of any section of this Agreement will be recognized or considered valid and no Union representative or Employer representative shall have the authority to change any provisions of this Agreement."

The question of damages was reserved for the taking of testimony, or making an order of reference to a special master, to determine the amount of damages suffered by plaintiffs following the disposition of all other issues in the action.

\* \* \* \* \*

Plaintiffs contend that the 1958 contract is unambiguous and that its pertinent provisions show that seniority was company-wide as held by the District Judge. They pointed out that Section 4 classifies employees as probationary, temporary and regular, and that Section 6 (b) provides that all probationary employees shall be laid off first, all temporary employees shall then be laid off in accordance with their seniority, and, when a 40-hour work week cannot be given to all regular employees, the regular employees shall then be laid off according to their seniority, the last regular employee to be the first laid off, and so on in order; and that the contract is silent, whether the layoffs are to be carried out on a single plant or a company-wide basis.

Section 6(b)(5) provides that there shall be a seniority list for Stroh check-

ers and a seniority list for Goebel checkers at Plant 1 and at Plant 3 that shall be strictly used to determine layoffs and recalls in the Checking Department *only*. Reading 6(b)(4) and 6(b)(5) together, it appears that the parties took pains to make it clear that the single seniority list of checkers was to control the layoffs of checkers in both plants on a company-wide basis. The fact that it was specifically stated that this provision was to apply to checkers only would indicate that the single seniority list would not apply to bottlers and other employees. We think there is an ambiguity in Sections 6(b)(4) and (5).

Section 11 provides that employees shall have preference of shift in the order of their seniority. It is argued that in order to sustain the claim of seniority on a plant-wide basis that it would be necessary to read the word "all" out of Section 6(b) of the contract, and to eliminate the definition of seniority in Section 11.

It is contended that the understandings, agreements and customs of the Union and the Company from 1948 until 1958 do not change the 1958 agreement because such understandings and agreements were not negotiated and ratified in accordance with the requirements of Union procedure and were superseded by the agreement of May 22, 1958.

As previously indicated, we do not share the view of plaintiffs as to the certainty of the meaning of the seniority provisions in the contract. Even plaintiffs, in submitting their grievance to the Local Union were not sure of the contract meaning with respect to seniority. In the statement of their grievance they say: "We have checked the contract very carefully and can find nothing stating that we have either Company or Plant seniority."

In their appeal to the International Union, they repeated that neither they nor the Local Executive Board could find anything in the contract stating that they had either company or plant seniority, and further stated that "the type of

seniority that we have is not defined in the contract."

Similar doubts as to the meaning of the contract are created by the comparison of Section 6(b)(5) and Section 6(d), the latter section providing that a *list* of employees arranged in their order of seniority shall be revised and posted March 1 and September 1 of each year and a copy of the *seniority list* shall be furnished the Local Union. The question arises, whether the word "list" applies to each plant or to one plant. The Company and Local Union construed it to mean a list for each plant.

■ The record shows clearly that except for the checkers, each plant has had a separate seniority list since 1949, which it has used in determining layoffs, recalls, shift preference, vacation preference and division of overtime, and that no employee of one plant has been permitted to exercise his seniority to bump an employee in the other plant. Where past practice has established a meaning for language that is used by the parties in a new agreement, the language will be presumed to have the meaning given it by such past practice. Werne, Law and Practice of the Labor Contract, Vol. 1, pp. 195, 196.

■ The contract must be construed to give effect to the intent of the parties when it was made and the circumstances existing at the time it was made should be looked to to ascertain the intent. Sobczak v. Kotwicki, 347 Mich. 242, 249, 79 N.W.2d 471 (1956).

■ When parties by their uniform conduct over a period of time have given a contract a particular construction, such construction will be adopted by the courts. Chesapeake & Ohio Railway Co. v. Michigan Public Service Commission, 347 Mich. 234, 240, 79 N.W.2d 586.

"The construction of a contract which the parties have given it while operating thereunder, should be followed." Franklin Fire Ins. Co. v. Chesapeake & Ohio Railway Co., 140 F.2d 898, 899 (C.A.6).

Plaintiffs are residents of Michigan and were employed there, and the collec-

tive bargaining agreement was made in Michigan. This Court has held under like circumstances that the law of Michigan is important, if not indeed controlling. Union News Co. v. Hildreth, 6 Cir., 295 F.2d 658, 663. In the same case, the Court quoted with approval the language of the Michigan Supreme Court in the case of Cortez v. Ford Motor Company, 349 Mich. 108, 84 N.W.2d 523, as follows:

" 'Our Court has repeatedly held that proper exercise of such discretion over grievances and interpretation of contract terms in the interest of all its members is vested in authorized representatives of the Union, subject to challenge after exhaustion of the grievance procedure only on grounds of bad faith, arbitrary action or fraud.' 349 Mich. 108, at page 121, 84 N.W.2d 523, at page 529."

Defendants owed plaintiffs the duty to exercise fairly the power conferred upon them under the National Labor Relations Act without hostile discrimination. If they exercise that power in good faith, which would mean free from hostile discrimination, they would not be liable for a mistake in interpreting the bargaining contract.

In the case of Ford Motor Company v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, relied upon by plaintiffs to support their contention, the Court said:

"The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

Another case relied upon by plaintiffs is that of Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, reversing 223 F.2d 739 (C.A.5). That case involved representative action by members of a local negro union against representatives of a local white union to obtain judgment declaring void bargaining agreement which provided for two lines of seniority based upon race. The case involved hostile discrimination upon the part of the bargaining agent and is differentiated on its facts from our case.

If the contract provides for company-wide seniority when properly interpreted, was the duty of fair representation violated by the Local and International Unions in misinterpreting the contract and in failure to arbitrate plaintiffs' seniority problem with the Company? Plaintiffs contend that the Unions acted in bad faith, arbitrarily and fraudulently. As evidence of bad faith, they rely on the letters of the International to the Local in connection with the dispute over the 1955 layoff. In the first letter dated January 20, 1956, the International pointed out that the various provisions governing seniority were drawn as though they applied on a company-wide basis rather than a plant-wide basis and suggested arbitration of the dispute. The second letter dated February 2, 1956 contained no reference to the language of the contract. It was devoted to defending the Local's position that the employees had plant and not company-wide seniority. It is argued that the letters are significant because the letter of February 2, 1956 was the only one read to the membership by Hann, the Business Agent. The International based its refusal to represent plaintiffs following the 1958 layoff upon the previous decision with reference to seniority rights first made in connection with the 1955 layoff and announced in these letters.

It is argued by plaintiffs that the contract provides for the order of layoff in clear terms and the Unions arbitrarily failed to follow the terms of the contract. On the question of fraud, plaintiffs contend that defendants placed reliance on a series of memorandums and letters between the Local and the Company, both oral and written, to establish plant seniority. It is contended that none of the understandings found in the memo-

randums and letters were reached pursuant to the requirements of the Union constitution and are void by the terms of the Union constitution and the terms of the negotiated contracts; that no explanation is offered as to why the so-called understandings were not incorporated into the collective bargaining agreements made subsequent thereto; and that since the understandings were not divulged to the Union members, a deceit was practiced upon them by the Company and the Union. They further argue that correspondence between the Union and the Company was not brought to the knowledge of the Union members and defendants should have insisted upon the inclusion of provisions for plant seniority during the 1958 negotiations if they felt they owed the Company any duty in that respect. Plaintiffs argue that a secret agreement between the Union and the Company as to the terms of the agreement was a fraud upon its members, and that the defendants are asking the Court to hold that they have discharged their duty of fair representation by nullifying the express provisions of the contract.

In our case, the District Court did not find that the defendants acted arbitrarily or with bias, or in bad faith or with hostile discrimination. The bill of complaint charged that the defendants failed to represent plaintiffs fairly and equally and showed partiality and favoritism towards those persons who are still employed by the Company.

The District Court concluded that whether the defendants deliberately discriminated against or intended to discriminate against plaintiffs was immaterial to the resultant effect upon plaintiffs and that there was a breach of duty of fair representation which resulted in injuries to plaintiffs.

Defendants construed the contract in the same manner that it had been construed by the Company and by the Local Union for a period of some nine or ten years and the language in the 1958 contract with respect to seniority was identical with that in the preceding contracts over the entire period of time.

The case of Trotter v. Amalgamated Association of Street Electric Railway, etc. et al., 309 F.2d 584, decided November 9, 1962, by this Court in an opinion by Judge Shackelford Miller, involved a question of seniority similar to the one involved in our case. In that case, the Court said:

"Appellants rely strongly upon Steele v. L. & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, Tunstall v. Brotherhood, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, Mount v. Grand International Brotherhood of Loc. Eng., 226 F.2d 604, C.A.6th, cert. denied, 350 U.S. 967, 76 S.Ct. 436, 100 L.Ed. 839 and Hargrove v. Brotherhood of Locomotive Engineers, 116 F.Supp. 3, D.C. These cases are examples of the now well settled rule that the bargaining representative of employees has the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against any employee or group of employees. Whether the bargaining representative has acted fairly and impartially and without hostile discrimination *depends upon the facts of each case.* \* \* \*" (Emphasis added.)

The Court concluded that there was no hostile discrimination.

Although the facts in that case were not the same as those now before us, the rationale of the decision supports our conclusion. The facts which we have recounted and the findings of the District Court which we have reviewed indicate to us that throughout the ten-year history of this contract, the actions of the Union were governed by candidness in its dealings with its members. There was a recognition of the possible conflict between the members of the Union in the two plants and Union officers more than once endeavored to have the matter resolved prior to negotiations with the Company. The record

is clear that the plaintiffs to this lawsuit were well aware of the difficulty and that they declined to bring the matter to a vote within the Union because they felt they would lose in a contest with the members of the other plant. Under these facts, we do not see how the Union either deceived its members or favored one group over another. In our opinion, in their bargaining negotiations with the Company, the facts show that the defendants acted fairly and impartially and with no hostile discrimination toward the plaintiffs and those whom they represent in this lawsuit.

It results that the decision of the District Judge must be reversed and the case dismissed.