**UNION NEWS COMPANY, a New York Corporation, Defendant-Appellant,**

v.

**Gladys HILDRETH, Plaintiff-Appellee.**

No. 14224.

United States Court of Appeals Sixth Circuit.

Oct. 2, 1961.

As Amended Nov. 9, 1961.

Before MILLER, Chief Judge, and CECIL and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This is an appeal by defendant-appellant, Union News Company, from a judgment for $5,000.00 entered upon a jury verdict in favor of plaintiff-appellee, Gladys Hildreth. Her complaint charged that she had been discharged from defendant's employ without just cause, in breach of a collective bargaining agreement between defendant and the Hotel and Restaurant Employees and Bartenders International Union, AFL, Detroit Local Joint Executive Board, hereinafter referred to as the Union. Damages awarded included wages lost by plaintiff

between her discharge and the time of trial and damages she claims she will suffer through loss of seniority as defendant's employee.

Defendant operated a soda fountain and lunch counter at the Michigan Central Railroad terminal at Detroit. Plaintiff was one of a crew of eleven or twelve persons employed at said counter. She had been employed at the Detroit terminal for about ten years, and was a member of the Union. During the period of plaintiff's employment, the Union was the designated exclusive bargaining representative of defendant's employees. The current agreement between the Union and defendant, dated October 15, 1957, was to run for one year with the usual provision for automatic yearly renewals unless terminated by either party.

Material and relevant to the issues on this appeal are the following paragraphs of the Collective Bargaining Agreement:

"14. No regular employe covered by this Agreement shall be discharged except for just cause. In the event of a claim by the Union that an employe has been discharged without just cause, such claim must be filed with the manager of the unit within five (5) days and disposed of by him within five (5) days thereafter. If the matter cannot be satisfactorily adjusted between the Union and the employer's manager, the same shall be promptly referred to the employer's home office at 131 Varick Street, New York City.

"15. Any and all questions and discussions which at any time may arise affecting the employes of the employer shall be taken up with the manager of the unit involved at such time and place as will be mutually agreed upon between the Union and the manager.

\* \* \* \* \* \*

"17. During the term of this agreement, any question arising hereunder which cannot be directly and satisfactorily adjusted between the Union and the employer shall be referred to a Committee which shall consist of one member representing the Union, one representing the employer, and a third member to be mutually agreed upon by the employer and the Union, and the decision of any two (2) members of such Committee shall be final and binding upon the parties hereto."

On March 14, 1958, plaintiff was laid off by defendant. Her layoff matured into a discharge as discussed hereinafter. For a period of nine to twelve months prior to plaintiff's discharge, the manager of defendant's enterprise was concerned about its cost experience at the counter where plaintiff worked. There was evidence that in the type of business there being carried on, efficient and honest work by counter employees should result in food costs being something less than 40% of the amount of gross sales; that a percentage of 35% to 37% in that regard is considered good; and that where the cost of merchandise reaches a figure above 40% of the amount of gross sales, it is indicative of a "poor operation" resulting from mishandling of merchandise and money by employees. Such mishandling could include dishonesty. From January, 1957, through February, 1958, this percentage was running rather uniformly above the 40% figure and was the cause of continuing discussions between defendant's manager and the Union. Defendant was unable to ascertain which of, and how many of, its counter employees were guilty of the misconduct causing its bad experience. Its manager suggested to the Union that the only solution was the replacement of all, or some of, the crew. The Union refused at first, suggesting less drastic measures such as talking to the girls and telling defendant's manager to "do the best you can and we will look into it further." Conditions did not improve, and in early 1958 defendant's manager opened its books to the business agents of the Union who made their own examination and analysis of defendant's continuing problem. In February, 1958, the food cost percentage was the highest, but one, of any of the preceding twelve months.

Union representatives made their own analysis of the records of defendant and concluded that some action had to be taken to remedy the situation. Defendant's manager suggested that the entire crew on the soda and lunch counter be replaced. The Union representative felt that such action was too drastic and between the Union agent and defendant's manager, it was agreed that five of the counter employees be given a three day layoff and be replaced by new employees. There was then to be a trial period of ten days to two weeks to see whether such change of crew would bring about an improvement. It was agreed that if improvement came it would demonstrate that the laid off employees were, at least partially, the cause of the trouble. In such case, the laid off employees would not be rehired. It was further agreed that if conditions did not improve following the layoff, such experience would exculpate the laid off employees of fault and they would be rehired and paid the wages lost during the period of the layoff. The laid off employees were replaced by other members of the Union. Following the replacement of the five employees, one of whom was the plaintiff, defendant's operation did improve and for the month of March the percentage of food costs to sales dropped from 43.46% for February to 39.90% for March and to 35.90% for April. This percentage remained below 40% for the entire balance of 1958, except for the month of August. In the week following the layoff, the cash receipts of the counter in question were $250.00 more than the final week with the old crew. After about ten days of the new operation, the Union agreed with defendant that it had proved its point and the replacement of the five employees became permanent. On the trial, plaintiff, to some extent, challenged the validity of the conclusions of the Union and defendant as to the significance of the food cost figures. However, there was no evidence of bad faith in the reliance of the Union and defendant upon such analysis.

After learning that she had been replaced, plaintiff took the matter up with her Union. On March 24th, a meeting was had at which the Union and defendant's representatives were present, as well as plaintiff and the other replaced employees. At this meeting, defendant's representative told plaintiff that she was laid off under Code No. 12, which meant "change of crew without prejudice." Such a termination of employment, the company representative said, would not disqualify plaintiff for unemployment compensation. When first laid off, she was told that it was for the good of the Union News Company, with mention being made of the bad condition at the fountain. She was told that the matter had already been cleared with the Union. Except for this meeting of March 24, plaintiff made no further contact with defendant until her attorney wrote a letter to it some months later. Plaintiff continued for a time to press for action by her Union. She was told that the Union was convinced that her discharge was for just cause. With the other discharged girls, she met with Union officers at the various levels of authority, and with the Union's grievance committee. This committee referred the matter to the Executive Board of the Union, and final consideration of it was had at a meeting of the Executive Board in June following the discharge. Plaintiff was present at this meeting. No action was taken by the Board and no grievance was ever presented by the Union on Plaintiff's behalf.

Between May 6, 1958, and November 14, 1958, there was an exchange of correspondence between plaintiff's attorney, the Union News Company, and the latter's counsel. Plaintiff's attorney, on May 6, 1958, and on behalf of plaintiff and the other discharged employees, demanded that Union News Company "meet with us for the purpose of continuing the processing of the grievance in accordance with their rights under the law." This letter was unanswered and on May 31 the attorney advised the Union News that unless it set a time for a meeting, "with the above named persons and the writer, to process their grievances arising out of their wrongful

discharge by you, legal action will be instituted to enforce their rights." This letter advised that a copy of it was being sent to the Union "in accordance with the provisions of Sec. 9 of the Taft-Hartley Act, to enable them to be present, but they will not participate in said grievance processing." In October, defendant's counsel advised that it was willing to proceed with grievance and arbitration proceedings as provided for in the bargaining agreement. Plaintiff's counsel however, advised that, "It is the intention of the grievants to process their own grievances, as provided by the Taft-Hartley Act (29 U.S.C.A. § 159) assisted by myself." Nothing further was done in this regard.

On July 11, 1958, the complaint in this case was filed. Its prayer for relief asked:

"A. That defendant may be ordered to meet with plaintiff for the purpose of processing her grievance out of her wrongful discharge, as provided by 29 U.S.C.A. Sec. 159.

"B. That defendant, Union News Company, may be ordered to pay to plaintiff Thirty Thousand Dollars, plus the loss of her wages to the date of trial, as compensation for the damages suffered by her."

It concluded with a prayer for general relief. The remedy sought under above paragraph A was not pursued in the trial court and is not involved here.

Plaintiff's complaint averred, inter alia, that the Union Local 705 was her "statutory collective bargaining representative and agent"; that her cause of action was bottomed upon the Union's contract with defendant; that she was discharged on March 14, 1958, "without just cause in violation of the terms and conditions of said contract of employment"; that "plaintiff has made numerous and several attempts to invoke the remedies provided by the grievance procedure, including arbitration, but defendant Union News Company has wholly refused, failed and neglected to discuss said grievance with plaintiff's collective bargaining representative or to permit plaintiff to present her grievance to it as provided by 29 U.S.C.A. § 159, commonly known as the Taft-Hartley Act."

The defendant's answer, with amendment thereto, denied that plaintiff was discharged without cause; denied that it refused to discuss plaintiff's grievance or to permit her to present her grievance; and affirmatively averred that plaintiff was guilty of carelessness "amounting to dishonesty or malfeasance in the handling of funds and merchandise of the defendant, which resulted in financial loss to defendant" and that the discharge of plaintiff "was agreed and consented to by * * * Local 705. * * *"

A first trial of the cause resulted in a verdict and judgment of no cause of action. A new trial was ordered which ended in the judgment for plaintiff before us on this appeal.

Upon trial, plaintiff testified that after her discharge on March 14, 1958, she sought other employment but that she was "obviously pregnant at the time." Her only child was born on October 22, 1958, plaintiff then being 39 years old. She stated that she had planned to work until about September 1, 1958, and that she had expected to be off work for about six and one-half months, including time before and after her confinement; that had she retained her job with defendant, she would have had an aunt look after her child while she worked. Plaintiff testified to no efforts to seek work after the birth of her child. Objection was sustained to defendant's effort to show that at the time of, and following, plaintiff's discharge, there was constant demand for the services of counter girls and waitresses in Detroit, and that the Union was regularly filling requests for such employment, but that plaintiff, although requested so to do, failed to go to the Union office for placement in another job. Defendant made such an offer of proof, supported by evidence upon a segregated record, after plaintiff's objection was sustained because defendant had not pleaded as an affirmative defense plaintiff's failure to mitigate her damages. The trial court denied defendant's

motion (made following the sustaining of the foregoing objection) to amend its answer to include such an affirmative defense.

Before discussion of the legal questions involved, we should add that there was no proof directly connecting plaintiff, individually, with dishonesty, wrongdoing, or malfeasance. We further, preliminarily, observe that in our opinion there was no evidence from which a jury could find that in agreeing to lay off and then discharge plaintiff and her co-workers in an effort to solve defendant's problems, there was any fraud, bad faith or collusion on the part of, or between, the Union's and defendant's agents. We do not think that the inability of defendant to place individual responsibility for its difficulties on plaintiff impairs the validity of our conclusion in this regard, nor prevents the discharge of plaintiff and her fellow workers being "for just cause." An employer should not be foreclosed from applying a remedy to stop a continuing loss merely because it cannot identify and isolate the particular source, or sources, of such loss. We state also that what was done by the Union and defendant after plaintiff's discharge could not, in our opinion, be relied upon as evidence of fraud, bad faith or collusion in the prior mutual agreement to terminate plaintiff's employment.

Defendant's motion for a directed verdict at the close of plaintiff's evidence, renewed after proofs were closed, was denied. This ruling, with others, makes up the questions involved on this appeal. Because we are of the opinion that defendant was entitled to a directed verdict of no cause of action, we do not reach other errors charged as ground for reversal.

It is our conclusion that, considering the statutory authority of the Union as the bargaining agent, the language of the collective bargaining agreement, and the undisputed facts as to the good faith bargaining between the Union and defendant, it was within the authority of the Union as bargaining agent to agree with defendant that there was just cause for plaintiff's discharge. Her discharge following, and pursuant to, such agreement was not a breach of contract by defendant.

Plaintiff is a resident of Michigan and was there employed by defendant. The collective bargaining contract was made in Michigan and the events here involved occurred there. Under like circumstances, we have held that "the law of Michigan is important, if not, indeed, controlling." Elder v. New York Central Railroad Co., 6 Cir., 1945, 152 F. 2d 361, 365. Under the law of Michigan, in accord with the weight of authority, an employer has the right to discharge an employee at will, unless such right is restricted or qualified by contract or statute. Lynas v. Maxwell Farms, 279 Mich. 684, 273 N.W. 315; Cortez v. Ford Motor Company, 349 Mich. 108, 84 N.W.2d 523; United States Steel Corporation v. Nichols, 6 Cir., 1956, 229 F.2d 396, 399, 55 A.L.R.2d 980, certiorari denied 351 U.S. 950, 76 S.Ct. 846, 100 L.Ed. 1474; N. L. R. B. v. Standard Coil Products Co., 1 Cir., 1955, 224 F.2d 465, 470; 35 Am. Jur. "Master and Servant" § 34, p. 469. Plaintiff's right of action, if any, must arise from the terms of the contract between the Union and the employer. Not only the sentence of that contract which provides against discharge without cause, but all other relevant provisions of the contract and existing law, must be respected in determining whether, in this case, plaintiff has established a cause of action for breach of such contract. Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 279, 76 S.Ct. 349, 100 L.Ed. 309, 318. Michigan, again in accord with general law, holds that seniority rights, which for this purpose we equate with protection against discharge without cause, do not arise as an incident to employment, but exist only by virtue of contract. Hartley v. Brotherhood, 283 Mich. 201, 206, 277 N.W. 885; Ryan v. New York Central Railroad Co., 267 Mich. 202, 208, 255 N.W. 365; Cortez v. Ford Motor Co., 349 Mich. 108, 112, 84 N.W.2d 523; Elder v. New York Central, 6 Cir., 1945, 152 F.2d 361, 365. What-

ever protection against discharge inured to plaintiff was the consequence of the *collective* action of plaintiff's Union. The Union, chosen as the statutory bargaining agent of plaintiff and defendant's other employees, is declared by statute to "be the exclusive representative(s) of all of the employees (in such unit) for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: * * *." (Title 29 U.S.C.A. § 159 [a]).

The question, then, for decision here is whether such statutory power, in combination with the terms of the bargaining contract, authorized the Union and defendant to mutually conclude, as a part of the bargaining process, that the circumstances shown by the evidence provided just cause for the layoff and discharge of plaintiff and other of defendant's employees. We conclude that it did. Unless such bilateral decisions, made in good faith, and after unhurried consideration between a Union and an employer, be sustained in court, the bargaining process is a mirage, without the efficacy contemplated by the philosophy of the law which makes its use compulsory.

 Neither the right of a Union to bargain for its members nor the correlative duty of an employer to recognize and bargain with such agent ends upon the signing of a contract. "For the collective bargaining power is not exhausted by being once exercised; * * *." Elgin, Joliet and Eastern Railway Co. v. Burley, 325 U.S. 711, 739, 65 S.Ct. 1282, 1297, 89 L.Ed. 1886, 1903. In this cited case, the majority of the Supreme Court held that a bargaining agent could not, through retroactive compromise, settle or wipe out a vested and already existing grievance or cause of action of an employee. Mr. Justice Rutledge was careful, however, to distinguish between the right of a Union to agree to prospective action and its power to dispose retroactively of existing grievances. "For it is precisely the difference between making settlements effective only for the future

and making them effective retroactively to conclude rights claimed as having already accrued which marks the * * * boundary between collective bargaining and the settlement of grievances." The collective bargaining authority is likewise not limited to the negotiations which periodically precede the making of new or successive contracts. The employer is required to deal with the bargaining agent in between times concerning working conditions and the carrying out of existing contracts. In National Labor Relations Board v. J. H. Allison & Co., 6 Cir., 1948, 165 F.2d 766, 3 A.L.R.2d 990, we held that an employer's duty to consult with the bargaining agent continued between contract negotiations. We there quoted from Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 346, 347, 64 S.Ct. 582, 585, 88 L.Ed. 788, 791, where Justice Jackson said, "Hence effective collective bargaining has been generally conceded to include the right of the representatives of the unit *to be consulted and to bargain* about the exceptional as well as the routine rates, rules, and working conditons." In Steele v. Louisville & N. R. R. Co., 323 U.S. 192, 202, 65 S.Ct. 226, 232, 89 L.Ed. 173, 183, dealing with the powers of one of the railroad brotherhoods under the Railway Labor Act, the Supreme Court said, "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents."

The National Labor Relations Board emphasizes the continuing duty of the employer to bargain concerning the administration of a contract, "It is now well settled that the statutory duty to bargain collectively does not close with the execution of the collective agreement. The employer is under the further duty to negotiate with the accredited bargaining agency concerning the modification, *interpretation and administration* of the *existing* agreement." Carroll's Transfer Co., 56 N.L.R.B. 935, 937. " * * * [T]he execution of a collective contract does

not end the process of collective bargaining. * * * the *interpretation* and *administration* of a contract already made and the settlement of disputes arising under any such contract are properly regarded as within the sphere of collective bargaining." Consolidated Aircraft Corp., 47 N.L.R.B. 694, 706. Professor Archibald Cox in his learned and comprehensive treatise "Rights Under a Labor Agreement" (69 Harvard Law Review 601, 622) says, "It is also settled law that the Union's right to bargain and the employer's correlative duties are not limited to the negotiation of an agreement. Both the N. L. R. B. and the courts have consistently held that to refuse to discuss grievances and questions of contractual interpretation violates Section 8(a) (5)."

■ The *interpretation* of a contract by the parties thereto is not done as a matter of academic interest or in a vacuum. Interpretation is employed where there are facts to which such an interpretation is to be applied. Here the contract forbade discharge except for just cause. A condition arose which called for an interpretation of such clause. The employer disclosed to the Union the facts which the company felt would constitute just cause for the discharge of some of its employees. After an investigation and appraisal of such facts, the bargaining agent agreed that such facts constituted just cause. For our conclusion we do not rely upon the fact that, after plaintiff's discharge, the Union failed to present or process a grievance on her behalf, nor upon the then expressed opinion of its representatives that her discharge was for just cause. We are aware of the authorities which have held that the collective bargaining agent's authority does not extend to a retroactive determination that a discharge was for just cause or to the waiver or settlement of an existing grievance. Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 761, 65 S.Ct. 1282, 89 L.Ed. 1886; Woodward Iron Company v. Ware et al., 5 Cir., 1958, 261 F.2d 138, 139; In re Norwalk Tire and Rubber Co., D.C., 100 F.Supp.

706; and cases gathered in note in 18 A.L.R.2d 352. Neither do we rely upon authorities which have held that under such a contract as the one here involved only the Union can process a grievance and if a Union refuses or neglects to do so, an aggrieved employee is without remedy against his employer.

We turn, then to the specific terms of the contract in this case to see whether what was done here was within the power of the contracting parties. The first sentence of paragraph 14 contains the prohibition against discharge "except for just cause." The next sentence of the paragraph provides that "[i]n the event of a claim *by the Union* that an employee has been discharged without just cause" certain procedures are to follow. Nothing is said about a claim by the *employee* to the same effect. Paragraph 15 provides that "any and all questions and discussions which at any time may arise *affecting the employees* of the employer *shall* be taken up with the manager of the unit involved at such time and place as will be mutually agreed upon between *the Union* and the manager." The discussion between the representatives of the Union and defendant concerning the prospective layoff and discharge of some of defendant's employees was a matter "affecting the employees" and obeyed the command of such paragraph.

Paragraph 17 provides that "[d]uring the term of this agreement *any question* arising hereunder which cannot be directly and satisfactorily adjusted between *the Union and the employer* shall be referred to a committee. * * *" Such committee is given authority to make a binding determination. It should be noted that the responsibility of implementing the contract's terms is, in each case, placed with the Union. Procedure to call into question a discharge is provided only in the event "of a claim *by the Union* that an employee has been discharged without just cause." We are impressed that a fair reading of these provisions discloses the contract's intent that the parties thereto had authority to do what was done here. The employer,

in keeping with its duty to bargain on all matters, presented its problems to the Union. It did not act hastily or unilaterally. The Union, on behalf of its members, refused initially to permit the discharge of defendant's employees. It urged further and less drastic methods. Discussion of defendant's problems continued for many months with submission by defendant to the Union of data which defendant asserted demonstrated that some discharges had to be made. The Union made its own study of this material and concluded that action had to be taken. It refused, however, to allow the defendant to discharge all of the employees in the unit and suggested a layoff of half of them with their ultimaté discharge if their replacement with new employees proved the company's point. The defendant acquiesced in the Union's suggestion and the layoffs and discharges were carried out in strict compliance with the programme agreed upon. We consider that the Union was acting in the *collective* interest of those who by law and contract the Union was charged with protecting.

We think the case of Cortez v. Ford Motor Co., 349 Mich. 108, 84 N.W.2d 523, while not providing an exact analogy for our decision, is supportive of our conclusion. There a group of female employees sought damages for claimed illegal and discriminatory layoffs. The propriety of the layoffs was the subject of extensive negotiation between the company and the Union. Such negotiations, ended in an accord between them that the layoffs were proper although to some extent a departure from the strict seniority provisions of a collective bargaining agreement. It is apparent that the Union and management agreed in advance as to the matter of layoffs, but the Union did present grievances on plaintiffs' behalf to the employer's foreman for disposition. It did not press such grievances further. In affirming a dismissal of the plaintiff's declaration on motion, Mr. Justice Edwards said,

"Our Court has repeatedly held that proper exercise of such discre-

tion over grievances and *interpretation of contract terms* in the interest of all its members is vested in authorized representatives of the Union, subject to challenge after exhaustion of the grievance procedure only on grounds of bad faith, arbitrary action or fraud." 349 Mich. 108, at page 121, 84 N.W.2d 523, at page 529.

Justice Edwards quoted from Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048, where the Supreme Court made reference to the quality and extent of the collective bargaining agent's authority as follows:

"Any authority to negotiate derives its principal strength from a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented."

In Hartley v. Brotherhood of Railway & Steamship Clerks, etc., 283 Mich. 201, 206, 277 N.W. 885, 887, a female employee was laid off by her railroad employer contrary to her acquired seniority. This was as a consequence of an agreement between the railroad and the Brotherhood (bargaining agent for the railroad employees) whereby married women were to be relieved from the service irrespective of seniority. The Supreme Court of Michigan held that it was within the power of the Brotherhood to modify the existing agreement, saying:

"This agreement was executed for the benefit of all the members of the Brotherhood, and not for the individual benefit of plaintiff. When, by reason of *changed economic circumstances*, it became apparent that the earlier agreement should be modified in the general interest of all members of the Brotherhood it was within the power of the latter to do so, notwithstanding the result thereof to plaintiff. The Brotherhood had the power by agreement with the Railway to create the sen-

iority rights of plaintiff, and it likewise to the same method had the power to modify or destroy these rights in the interest of all the members."

We approved the holding of that case and the quoted language in Elder v. New York Central Railroad Co., 6 Cir., 1945, 152 F.2d 361, 365.

■ The fact that in the case at bar the agreement by the Union to permit defendant to discharge plaintiff and others was not reduced to a written agreement or memorandum does not detract from its legality.

Professor Cox reviews what has been decided by the courts to date on this subject (69 Harvard Law Review 601) and what that distinguished scholar considers desirable in labor contracts and in courts' construction of rights growing out of them. He says:

"All this suggests that the bargaining rights of the majority representatives are as broad *in the administration of a collective agreement as in its negotiation*." (p. 622)

"In my judgment the interests of the individual will be better protected on the whole by first according legal recognition to the group interest in contract administration and then strengthening the representative's awareness of its moral and legal obligations to represent all employees fairly than by excluding the union in favor of an individual cause of action. Consequently, I would lean toward finding such an intention in an ambiguous agreement." (p. 657).

We find no precise precedent for our decision, but believe it comports with legal principle and is consonant with the beneficial objectives of collective bargaining, now so important a tool in the continuing efforts to strengthen the position of the individual through collective action. Unless those upon whom is placed the responsibility for protecting collective interests are given the authority needed to discharge such responsibility, the entire process is of doubtful worth. Under the philosophy of collective responsibility an employer who bargains in good faith should be entitled to rely upon the promises and agreements of the Union representatives with whom he must deal under the compulsion of law and contract. The collective bargaining process should be carried on between parties who can mutually respect and rely upon the authority of each other.

■ No motion for judgment notwithstanding the verdict was made by the defendant-appellant and this court is, therefore, limited upon reversal to granting of a new trial. Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849. The judgment of the district court is reversed and a new trial ordered.