Nathan T. DILL, Plaintiff-Appellee,

v.

The GREYHOUND CORPORATION, Southern Greyhound Lines, a Division of Greyhound Lines, Inc., the Amalgamated Transit Union, Local Division 1500, and the Southern Joint Council of the Amalgamated Divisions of the Amalgamated Transit Union, AFL–CIO–CLC, Defendants-Appellants.

Nos. 20275, 20276.

United States Court of Appeals, Sixth Circuit.

Dec. 18, 1970.

Solomon I. Hirsh, Chicago, Ill., for Southern Joint Council, etc.; Martin J. Burns, Jacobs, Gore, Burns & Sugarman, Chicago, Ill., on brief.

Robert F. Houlihan, Lexington, Ky., for Greyhound Corp., and others; Stoll, Keenon & Park, Lexington, Ky., on brief.

Donald R. Wellford, Memphis, Tenn., for appellee; McCloy, Wellford & Clark, Memphis, Tenn., on brief.

Before WEICK and MILLER, Circuit Judges, and MURRAH, Senior Circuit Judge *.

WEICK, Circuit Judge.

Dill instituted an action in the District Court against The Greyhound Corporation and its subsidiary, Greyhound Lines, Inc. (Greyhound), Southern Joint Council of the Amalgamated Divisions of the Amalgamated Transit Union, AFL-CIO (Southern Council), and Local Division 1500 of the Amalgamated Transit Union, AFL-CIO (Local 1500).

The suit was brought under the provisions of Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) to recover damages against Greyhound for breach of the provisions of a Collective Bargaining Agreement relating to seniority, and against Southern Council and Local 1500 for breach of their duty to represent Dill fairly.

The case was tried before the District Judge without a jury. He rendered an opinion in which he found that Greyhound breached the provisions of the agreement relating to seniority ranking, and ordered Greyhound to place Dill in an appropriate place on the seniority roster. The Court granted judgment against Greyhound for stipulated damages in the amount of $3,800.

The Court further found that Local 1500 did not violate its duty of fair representation, but that Southern Council did. The Court concluded that Dill was—

"* * * not entitled to recover compensatory damages from Southern Joint Council because of its failure to fairly represent him, but this is a proper case for the awarding of punitive damages against Southern Joint Council for its arbitrary action and reckless indifference to the rights of the plaintiff in failing to fairly represent him."

The Court then rendered judgment against Southern Council in the amount of $5,000 for punitive damages only. Both Greyhound and Southern Council appealed. We reverse.

Dill entered the employ of Greyhound as an apprentice mechanic on June 24, 1957. His application for employment was dated June 17, 1957; he was a member of Local 1500. The controversy in the present case, however, relates to Dill's rank in Greyhound's seniority roster of bus drivers, a position which he did not secure until April 10, 1964.

The employees of the Southern Division of Greyhound were represented by

eight local divisions of the Amalgamated Transit Union (ATU) in eight seniority districts. These eight divisions formed the Council of the Southern Greyhound Amalgamated Divisions (Southern Council), the membership of which Council consisted of a local division president from each division. The Southern Council acted as collective bargaining representative of all of Greyhound's operators, garage and terminal employees in the divisions, and negotiated the collective bargaining agreement in question. It also handled grievances where they were not determined at the local level and where the interests of employees represented by more than one of the locals were affected.

Prior to the 1962–1964 Collective Bargaining Agreement, Greyhound trained applicants for the job of bus driver in a drivers' school which it conducted. It paid students eight dollars per day while attending school. When training was completed the successful applicants were assigned as needed within the eight districts. After having been taught the routes involved (called "cubbing the run"), the drivers' names were placed on an assignment board.

The operator's seniority would start from the date and hour when his name was placed on the assignment board. The practice varied from district to district where several drivers satisfied their preliminary requirements at the same time. In one district they were ranked in alphabetical order; in other districts rank was determined by lot.

The 1962–1964 Collective Bargaining Agreement was executed on May 23, 1963, but became effective November 1, 1962. Its expiration date, October 31, 1964, was extended twice, with wage increases, and was effective through October 31, 1968. The form of the contract as to seniority was taken from a pre-1962 Eastern Greyhound contract. This contract was desired by the Southern Council because Eastern Greyhound employees were the highest paid employees in the entire Greyhound system. The provisions of the 1962–1964 contract relating to seniority read as follows:

"ARTICLE IV—NC. Section 1. SENIORITY ESTABLISH-MENT.

"The seniority rank of operators will be determined by the date of graduation from Drivers' School and prior to breaking-in and, as to simultaneous graduation, by the hour and date of application for employment. An operator graduated from Drivers' School ahead of his class will, for seniority rank purposes, be deemed to have graduated with his class. All applications are to be stamped as of the time of filing.

"Duplicate copies, properly stamped, will be furnished to the Local Division after applicants become employees.

"For pay rate purposes, commencement of employment shall be deemed to be the date of the commencement of actual service."

In the fall of 1963 Greyhound decided that it needed help in the recruiting, testing and training of drivers for the coming year [1]. On or about November 15, 1963, it made arrangements with Personnel Training Institute of Richmond, Virginia (PTI) to perform this service for it and to train the applicants at Atlanta, Georgia.

PTI advertised for prospects and selected those who met Greyhound's general standards; it took applications, conducted tests, and arranged for a final interview where students, if accepted by PTI, were instructed to report to PTI School in Atlanta. Names of prospects who had applied to Greyhound were turned over to PTI. When a prospect was accepted by PTI and satisfactorily

[1]. Normally, Greyhound employed from forty to one hundred new drivers each year. Because of the approaching World's Fair in 1964, it anticipated that it would be necessary to increase substantially its work force. Actually, it employed 247 new drivers in 1964.

completed his training at the school, he was required to pay PTI the sum of thirty-five dollars for each day of his instruction at the school. Greyhound did not contribute to that cost.

Dill had made application to Greyhound for the job of bus driver on September 4, 1963, at which time Greyhound was considering making the arrangement with PTI for driver training, and the arrangement was completed on November 15, 1963. Dill was required to make application for the PTI school and take an entrance examination, which he did on February 28, 1964 at 6:10 p. m. Dill's application was accepted after the tests, and he was sent to the first class (consisting of 82 trainees) at Atlanta. He had obtained a leave of absence from his job in the Maintenance Department. The class started on March 6, 1964, and finished on April 10, 1964. In all there were three classes, consisting of a total of 247 trainees. The remaining two classes were conducted in late April and May.

Prior to the beginning of the first class, Henry E. Bransom, Vice President in charge of Industrial Relations, decided, for purposes of determining seniority, to use the dates and hours on the PTI applications, rather than those on Greyhound's applications. His reasons were the facts that the company had turned over to PTI that phase of its operations, its supervisors were not responsible for maintaining records on students, and fewer applications had been submitted to the company than to PTI [2]. He did not advise Southern Council of his action, but Local 1500 was advised thereof by the company on June 16, 1964.

A notice, signed by the Director of Safety and Personnel of Greyhound Southern Lines, was placed on the school's bulletin board, stating that seniority would be based upon the time and date when PTI applications were filled out. The notice was dated March 31, 1964.

Dill claimed that he did not see the notice; however, before he was employed as a bus driver he knew that his seniority would not be based on his Greyhound application.

In the early part of July, 1964, the first seniority roster following the April 10th graduation was posted. February 28, 1964 was used in determining Dill's rank of 55th on the seniority roster out of the 82 drivers who had completed training on April 10th. He contended that the date of his application for the job of apprentice mechanic, June 17, 1957, should be used, which would rank him second

2. Bransom instructed Greyhound's representative at the PTI school, John Moran, to procure the dates and times of the students' PTI applications. Moran was Safety Supervisor of the company's Georgia Region and a former bus driver. He, along with other company employees, had been sent to the school when PTI was having difficulty in its training program.

PTI was reluctant to allow Moran to inspect its files. It finally agreed, however, to permit him to photocopy the first page of each PTI application, which was believed to contain the requested information. PTI did not have a photocopier and did not have funds to rent or purchase one. It secured a photocopier and some paper from a local distributor, on a trial basis, representing that it was interested in purchasing a machine.

Moran copied the first pages of applications until he used all the paper. PTI endeavored to procure more paper from the dealer, who refused to furnish it. Moran then decided to copy by hand the information on the remaining applications, but was advised by PTI that it had shipped all of its files to its main office in Richmond, Virginia. He called PTI in Richmond and was advised that its office there had been padlocked and no one could get in.

Moran then decided to secure the information from the students, and advised the company in Lexington of his intention. He interviewed each student and, without informing him of the purpose, had him fill out a card with the date and time of the PTI application. He prepared a roster from the PTI forms and the cards and sent it to Lexington, where a new roster was prepared based on the information supplied by Moran.

on the list, or that in the alternative, the date on his application for the job of bus driver, filed with Greyhound on September 4, 1963, should be used, which would place him fifth on the list.

Dill complained orally to the company, but it refused to change the roster. He filed a written grievance with the president of Local 1500 and was advised that two similar grievances had been filed; that the cases were coming up at the next Company-Council meeting in Atlanta; and that if any change was made, "then all others would be straightened out accordingly." Dill never filed a written grievance with Greyhound. Local 1500 did not forward Dill's grievance to the Council.

The District Judge ruled, however, that the Local's failure to forward the grievance to the Council was immaterial because his grievance would be governed by the outcome of the two similar grievances which were being processed. These two similar grievances were filed by bus drivers Nipp and Douthitt, who graduated with Dill in the April 10-class, and who asserted that their seniority rank should be based on the dates and time of their Greyhound applications [3].

3. The Southern Council and the company met in Atlanta on August 26, 1964, to discuss the Douthitt-Nipp grievance and other matters. At this meeting the Council was advised for the first time that the company had used PTI application dates to establish seniority ranks for all PTI graduates, although the president of Local 1500 knew of this method of seniority ranking during the previous June.

Southern Council had not been furnished copies of the PTI or Greyhound applications and was unable to discuss the matter for lack of the necessary information. At the request of the Council the company agreed to send to it all PTI and Greyhound applications of the 247 PTI graduates. Further discussion was postponed until the next meeting.

In the meantime, contact was made by the company with the various regional offices of Greyhound to obtain the forms. Many PTI applications were missing, but all that the company had were bundled and mailed in November, 1964 to Daniel V. Maroney, Jr., Chairman of the Council.

The Council met again on January 12, 1965, and went over all of the PTI and Greyhound forms which had been sent to it. None of the Council members examined all of the forms, but it was soon ascertained that the applications were not in very good shape. There were some forms with a date but no time thereon; some forms with the time but no date; others did not have either time or date. There were some operators with only PTI or Greyhound forms, some operators with both forms, and others with neither form. The problems were discussed and the Council voted to appoint a committee, consisting of the financial secretaries of the local divisions, to go over the forms and endeavor to arrive at some recommendation for the Council.

The appointed committee then met in another room and, assisted by about another seven local division officers, spent approximately four hours going over the forms and trying to build a complete roster. Most of that time was spent on the forms for the April 10-class. The committee members had difficulty in arranging the forms and believed that some forms had been lost or at least had become unavailable. One committee member testified that there were more PTI forms and fewer Greyhound forms than were produced at the trial four years later; that there were from twenty to twenty-five men in the group for whom no forms were supplied, and the rest were about evenly divided.

The committee considered other means of ranking, but rejected them on the ground that they would not comply with the provisions of the contract. The committee reported to Council that from the records supplied by the company it could make no recommendation for changing the seniority roster.

The members of Council discussed the matter further and then met with the company. Council learned for the first time that the company had resorted to individual interviews to compile the information on PTI applications which had been sent to the main office of PTI and were not available. Council realized that—

" * * * we had quite a problem on our hands, not only of determining the grievance of the seniority of Nipp and Douthitt, but of determining the seniority of all the people involved in this."

The parties decided the matter needed further study and agreed to postpone action until the next meeting.

The Council contacted the Eastern Council in order to ascertain how it

The collective bargaining agreement provided an exclusive four-step grievance procedure: the first two steps could be invoked by either the association representative or the employee, but the last two steps, which included arbitration, could be invoked only by the association representative. Dill never requested the association representative to invoke arbitration.

When Dill received notice of the decision of the Southern Council on the grievances of Douthitt and Nipp, he appealed to the International Union, which denied his appeal. Dill then appealed to the Convention of the International Union, and appeared before its Appeals Committee. The Appeals Committee reported against Dill, and its report was sustained by a vote of the members attending the Convention. Dill then filed the present suit in the District Court. The defenses of Greyhound and Southern Council require separate treatment.

Greyhound has two strings to its bow. It contends first, that it did not breach the contract and, second, that Dill did not exhaust the grievance procedures of the collective bargaining agreement.

Relative to the breach of contract claim, it is necessary to construe Article IV, Sec. 1 of the collective bargaining agreement which we previously quoted and which provides that the seniority rank of operators graduating simultaneously from drivers' training school is determined "by the hour and date of application for employment."

Dill contended that his application for employment as an apprentice mechanic, which was dated June 17, 1957, should control or, in the alternative, that his application for employment as a bus driver filed with the company on September 4, 1963, should control rather than his application to PTI on February 28, 1964.

The language in the agreement is certainly broad enough to sustain Dill's reliance on the 1957 application, but such a situation was certainly not contemplated by the parties when the agreement was entered into. Dill's application was for a new job as bus driver, and there is no good reason why he should be rated ahead of other applicants for the same job.

We are of the view that the company's decision in this respect, which decision was sustained by the District Court, is a reasonable construction of the contract. Dill did not appeal from the judgment of the District Court, and the claim is therefore not properly before us.

We now consider whether the company breached the contract by treating the applications filed with PTI as applications for employment instead of Dill's 1963 Greyhound application. Here, again, it is clear that the collective bargaining agreement contemplated a Drivers' School, which traditionally had been conducted by the company. Circum-

interpreted the seniority clause in its contract, but could get no assistance because Eastern had never used an outside training agency.

The Council met for the third time on March 10, 1965, to discuss the grievances in question and other matters. All Council members were bus drivers with at least fifteen years' experience, and thus they knew the importance of seniority to the drivers. They concerned themselves with the problem of "trying to put all of them in their proper slot if at all possible."

They discussed alternative methods of establishing seniority ratings but rejected them as not being in accord with the collective bargaining agreement.

The Council noted that the drivers were working under the structure of seniority established by the company and was of the opinion that there was no way to adjust the PTI graduates' seniority properly and in complete accord with the contract, and decided not to seek arbitration. The vote was 8 to 0.

Maroney testified that in the event of arbitration the Council would have to submit the rankings of all three PTI classes' graduates, and that the arbitrator would have required Council to submit a plan for the ranking of the operators, which it could not do from the company's records.

Council then met with the company, and it was agreed to settle the grievances, letting the seniority roster stand unchanged.

stances changed and it was necessary for the company to arrange for the training of a large number of potential drivers because of the approaching World's Fair. It decided to delegate this training function to an outside agency, PTI. We assume that this decision to engage the services of an outside agency was a management prerogative; at least it has not been questioned. The company decided also to use the dates and hours on PTI applications, rather than those on Greyhound applications, in determining seniority. The reasons were the facts that the company had turned over to PTI that phase of its operations; that Greyhound's supervisors were not responsible for maintaining records on students; and that fewer applications had been submitted to the company than to PTI. It will be recalled that PTI advertised for students, and most of the 247 trainees filed their applications direct with PTI, and not with Greyhound.

■ Under this circumstance was it an unreasonable construction of the collective bargaining agreement for the company to treat applications filed with PTI as applications for employment, for the purpose of determining seniority? We think not. In our opinion, the company's interpretation was just as reasonable as the ruling that Dill's seniority cannot be based on his prior application for employment as an apprentice mechanic.

The District Court construed the language, "application for employment" in the collective bargaining agreement to mean application for employment with Greyhound. The Court stated:

"It did not mean an application to attend the PTI drivers' school. We agree that, where a driver trainee who was attending the school had not made such application to Greyhound but had made such application to PTI, it might be a permissible interpretation of the contract to treat the application to PTI as an application for employment."

We do not follow this reasoning. All of the trainees had filed their applications with PTI and the company had decided to use the dates and hours on these applications to determine seniority. Merely because a trainee had also filed an application with Greyhound ought not to entitle him to preferential treatment; nor would Greyhound be justified in treating the applicants differently.

The prior practices of the company with respect to operation of its own training school do not aid in interpreting the agreement; nor were we helped by the Eastern Council which did not use an outside agency for conducting a training school.

The collective bargaining agreement provided an exclusive remedy for the adjustment of grievances, two parts of which could be utilized by an employee. Dill filed a written grievance with Local 1500. He filed no written grievance with the company, and he did not request arbitration either to the company or to his bargaining representative.

■ Under federal law, grievance procedures required under the agreement must be exhausted before direct legal redress may be sought. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

■ Exhaustion is not required, however, of steps of the grievance procedure where, under the collective bargaining agreement, the sole power to invoke that step is vested in the bargaining agent (and/or the company) and the bargaining agent does not fairly represent the employee. Vaca v. Sipes, 386 U.S. 171, 185, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

The only question remaining is, therefore, whether in the settlement of the Douthitt-Nipp grievances without invoking arbitration, the bargaining representative was guilty of unfair representation of its employees.

■ In order to establish unfair representation it would have been neces-

sary for Dill to establish by a preponderance of the evidence that the Council acted arbitrarily or in bad faith. Vaca v. Sipes, *supra*; Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

In Balowski v. International Union UAW, Circuit Judge Phillips, now Chief Judge, who wrote the opinion for the court, stated:

> "An action will not lie against a union for failure to process a grievance absent a showing of fraud, misrepresentation, bad faith, dishonesty of purpose or such gross mistake or inaction as to imply bad faith. Williams v. Kroger Co., 369 F.2d 85 (C.A. 6), (1966). * * *" 372 F.2d 829, 834 (6th Cir. 1967).

In Ford Motor Co. v. Huffman, the Court stated:

> "Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

See also Humphrey v. Moore, *supra*; Simmons v. Union News Co., 341 F.2d 531 (6th Cir.), cert. denied, 382 U.S. 884, 86 S.Ct. 165, 15 L.Ed.2d 125 (1965); Hildreth v. Union News Co., 315 F.2d 548 (6th Cir.), cert. denied, 375 U.S. 826, 84 S.Ct. 69, 11 L.Ed.2d 59 (1963); Union News Co. v. Hildreth, 295 F.2d 658 (6th Cir. 1961).

An employee does not have an absolute right to require his bargaining representative to—

> "* * * press his complaint all the way to the very end of the grievance procedures made possible by the collective bargaining agreement. * * * It follows from this that proof that the union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation." Bazarte v. United Transp. Union, 429 F.2d 868, 872, 75 L.R.R.M. 2017, 2019 (3rd Cir. 1970).

While the District Court found that in settling the grievances and in failing to proceed to arbitration the Council acted "arbitrarily and in reckless disregard of Dill's rights," it made no finding of hostility, malice or bad faith.

There was no proof of any hostility or malice on the part of the Southern Council to Douthitt, Nipp, or Dill; nor was there any evidence of its bad faith in settling the grievance.

The District Court construed the collective bargaining agreement differently than the parties did. Even if the parties were incorrect in their interpretation of the agreement, this alone would not impose a liability on the part of the Council. Bazarte v. United Transp. Union, *supra*; Balowski v. International Union UAW, *supra*; Ratner, Some Contemporary Observations on Section 301, 52 Georgetown L.J. 260, 283 (1964). But here, we are of the opinion that the parties' interpretation was reasonable.

In Untied Steelworkers of America v. American Mfg. Co., the Court said:

> "When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal." 363 U.S. 564, 569, 80 S.Ct. 1343, 1347, 4 L.Ed.2d 1403 (1960).

While this statement related to arbitration, it does not negate the validity of the interpretation of the parties in settling a grievance.

Dill's grievance was that his seniority should be based on Greyhound's, and not PTI's, applications. To allow his grievance would displace other employees on the seniority roster and throw the entire roster of 247 employees out of kilter, the roster under which the parties have been operating since 1964.

The Southern Council gave careful consideration to the grievances over a period of months and endeavored to work out a solution but was unable to construct a different seniority roster because of the inadequacy of seniority records. The Council was composed of bus drivers of long experience who were fully cognizant of the importance of seniority rank. Under these circumstances, it can hardly be said that the Council acted arbitrarily or recklessly.

▉▉ In our opinion Southern Council did not violate its duty to represent fairly the union members. It follows that the finding of the District Court that the Council acted arbitrarily and recklessly is not supported by substantial evidence and is clearly erroneous. We further find no basis for the award of punitive damages against the Council. The findings of the District Court, if supported by substantial evidence, would have justified an award of compensatory damages only, but the Court found that Dill did not sustain any compensatory damage as a result of the acts of the Council.

An award of punitive damages where no actual damage is found, is not authorized. Allen v. Melton, 20 Tenn.App. 387, 389 (1936), 99 S.W.2d 219, citing Sutherland on Damages, (3d Ed.), Vol. 2, § 406, p. 1129. This doctrine was later approved by the Supreme Court of Tennessee. Lazenby v. Universal Underwriters Ins. Co., 214 Tenn. 639, 383 S.W.2d 1 (1964); Liberty Mut. Ins. Co. v. Stevenson, 212 Tenn. 178, 180, 368 S.W.2d 760 (1963).

The judgment of the District Court is reversed and the cause is remanded with instructions to dismiss the complaint.