Jacob SUISSA, Plaintiff-Appellant,

v.

AMERICAN EXPORT LINES, INC.
(f/k/a American Export Isbrandtsen
Lines, Inc.), Defendant-Appellee.

No. 346, Docket 74–1601.

United States Court of Appeals,
Second Circuit.

Argued Dec. 4, 1974.

Decided Dec. 20, 1974.

Richard P. Lerner (Lorenz, Finn, Giardino & Lambos, New York City, C. P. Lambos, New York City, of counsel), for defendant-appellee American Export Lines, Inc.

Max Cohen, New York City (Klein, Cohen & Schwartzenberg, New York City, on the brief), for plaintiff-appellant Suissa.

Before KAUFMAN, Chief Judge, and ANDERSON and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Whether a maritime worker who has followed the grievance procedures provided by a collective bargaining agreement should, after a disposition of his grievance, be permitted to seek judicial recovery of his claim for wages under 46 U.S.C. § 596 (1970) is the novel question which we are called upon by this case to decide. Jacob Suissa appeals from summary judgment by the United States District Court for the Southern District of New York, dismissing his complaint for overtime and statutory penalties allegedly owed him by American Export Lines, Inc. [AEL]. We affirm.

Jacob Suissa, a member of the National Maritime Union of America, AFL–CIO [NMU], served as an electrician aboard the S.S. Exford during a foreign trip which began October 3, 1972. The vessel was owned by American Export Lines, Inc., a party to a collective bargaining agreement under which NMU was to act as the representative for the company's unlicensed personnel. Approximately one week after the ship had sailed, Chief Engineer Eisner informed Suissa that he would not authorize requested overtime for "cargo watches." These were not hours during which Suissa had actually worked. Rather, he felt that he was entitled to automatic authorization and payment under Article V, § 25(d) of the AEL–NMU bargaining agreement merely for being aboard while cargo was being worked during overtime hours.[1] Suissa's affidavit submitted to the district court discloses that he had been paid overtime on a prior voyage aboard the Exford for all such hours. While at sea, Suissa also complained that work which should have been performed by electricians had been usurped by the chief, and first and second assistant engineers. He claimed his pro rata share under the contract for that work.[2] While still aboard, he submitted both grievances to the Union, and when discharged at the conclusion of the voyage on February 13, 1973, he confirmed his intention of resorting to grievance procedures by immediately proceeding to his local union representative, NMU Patrolman LaForgia.

---

1. Article V, § 25(d), as it appears in the copy of the Agreement effective through June 15, 1972, provides:

 *An Electrician is required to be aboard the vessel while it is in port and working cargo whether or not he is actually working, [sic] he shall receive overtime for all hours that he is required to be aboard other than his regular hours. [Emphasis added.]*

 As reproduced in the Agreement effective from June 16, 1972 through June 15, 1975, however, that subsection states:

 *When an Electrician is required to be aboard the vessel while it is in port and working cargo whether or not he is actually working, he shall receive overtime for all hours that he is required to be aboard other than his regular hours. [Emphasis added.]*

 Copies of both agreements were submitted by AEL to the district court.

2. Article I, § 36 of the Collective Bargaining Agreement provided:

 (a) . . . It is agreed that work traditionally assigned and/or performed by Unli-

Suissa suggested to LaForgia that AEL owed him payments for 361½ hours of alleged cargo time, 90 hours as his share of work which had been usurped, and 2 additional hours which he claimed actually to have worked. As provided by the contract,[3] LaForgia presented Suissa's grievance to AEL's local representative, Payroll Master Nehrbauer. The two men agreed that same day to settle the claim by a payment for 50 hours,[4] although the Union representative reserved the right to refer the settlement to the NMU National Office for approval.[5] The following day Mel Baresic, the NMU Vice President In Charge of Contract Enforcement, informed Captain Shrivers, AEL's Manager of Operations, that the offer was not acceptable to the Union. After further discussion, the grievance was settled by AEL's agreement to pay penalty time for 86 hours, and Suissa was notified that a check in the proper amount was available at the AEL Payroll Office.

Although the agreement permitted NMU to submit Suissa's grievance to ar-bitration,[6] the Union apparently found the settlement acceptable, and chose not to do so. On March 15, 1973, Suissa wrote his Union, stating:

> I want the record to show that all remedies have been exhausted under the Collective Bargaining Agreement (NMU) as to arbitration or any other out-of-court disposition of my claims. I am presently entitled to commence an independent lawsuit against American Export Isbrandtsen Lines, Inc.

One week later he filed an action in the New York County Civil Court to recover $3,384.82, the full amount to which he felt he was entitled for the 453.5 hours earlier requested. The complaint also sought to collect the statutory penalty provided by 46 U.S.C. § 596 (1970) for delayed payment of wages.

Soon thereafter, AEL removed the action to the United States District Court for the Southern District of New York, contending that the complaint—properly construed—stated a claim under § 301 of the Labor Management Rela-

---

censed Personnel shall not be performed by or assigned to any other persons provided Unlicensed Personnel are available and prepared to perform such work . . . . Whenever such work is performed by persons other than Unlicensed Personnel . . such work shall be paid for at the applicable premium rate and such payment shall be divided among the Unlicensed Personnel ordinarily required to perform such work.

**3.** Article I, § 4(b):

2. If the grievance cannot be resolved under the provisions of paragraph (a) . . the decision of the Master shall govern . . . until the vessel arrives at a port where the Company maintains an operating office and the Union maintains an office. The dispute shall then be referred to a representative of the Union who, if he believes it has merit, shall attempt to resolve it with the local representative of the Company. The Company reserves the right, where necessary, to refer a dispute to its head office for final settlement. Similarly, the Union reserves the right, where necessary, to refer a dispute to its National Office for disposition with the head office of the Company. It is understood, however, that this right will be used sparingly and that both Parties will make every effort to settle disputes in the port where they arise.

**4.** The payment was to be computed at the "penalty" rate of $2.74 per hour, rather than the overtime rate of $7.43 per hour. Suissa's claim for 361½ hours of "cargo watch" time was apparently foreclosed by the interpretation of Article V, § 25(d) of the bargaining agreement rendered in an arbitration proceeding held August 26, 1971 before Theodore Kheel, the arbitrator provided for by the NMU–AEL contract. The Union contended that "at all times when cargo was being worked, the past practice has been to have an electrician standing by . . .," and that the subsection in question should consequently be read to incorporate such a requirement. The arbitrator rejected the claim, holding that "in the absence of more compelling evidence of a clear past practice to have electricians stand by at all times, . . . I can [not] rule that the contract requires continuous standing by while winches are being worked."

**5.** See note 2 supra.

**6.** Article I, § 4 provided:

(c) Arbitration Procedure. If any dispute or grievance arising under the terms of this Agreement is not adjusted . . . in the manner hereinbefore provided, same may be submitted, by the Union or the Company . . . within thirty (30) days from the time grievance has been finally denied . . . to a Board of Arbitration . .

tions Act, 29 U.S.C. § 185 (1970).[7] American Export subsequently moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief could be granted. The district court, after considering the affidavit of Albert G. Fialcowitz, Director of Labor Relations for AEL, several annexed exhibits, and the affidavit of Suissa, treated the motion as one for summary judgment and granted it.

Judge Ward found that, although in the first instance Suissa might have sought either a judicial remedy or the relief provided by the collective bargaining agreement's grievance procedure, once he had elected to utilize the grievance procedures, he was precluded from litigating his alleged contractual rights in a court of law. The only judicial relief available against AEL in such circumstances, the judge decided, was pursuant to § 301 of the Labor Management Relations Act. But an individual employee's action under that section required allegations in the complaint sufficient to support a claim that the Union had failed in its duty of full and fair representation. Because Suissa's complaint and affidavit failed to make this showing, Judge Ward dismissed the action without prejudice to the filing of an amended complaint.[8]

## THE CLAIM FOR WAGES

Suissa's argument that he has a right to an independent judicial determination of the merits of his contractual wage claim, after having pursued his complaint through the grievance machinery established by the collective bargaining agreement, is dependent upon the interpretation to be given U.S. Bulk Carriers, Inc. v. Arguelles, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971). The Court there read the provisions of 46 U.S.C. § 596 (1970), concerning the amount and schedule for payment of seamen's wages, and penalties for employer noncompliance, to imply a judicial remedy which an aggrieved maritime worker might in the first instance pursue in lieu of the grievance procedures favored by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970). But we do not understand Arguelles to be applicable to cases where the seaman has initially resorted to his contractually established remedy.

In allowing an individual to bring his claim for wages directly before a judicial tribunal, Arguelles established an exception to the otherwise rigid principle enunciated in Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), that contract grievance procedures must be exhausted be-

---

7. It is true that in personam actions are not generally removable, since the "saving to suitors" clause of 28 U.S.C. § 1333(1) (1970) has been read to preserve the jury rights of suitors who wish to proceed in civil actions in state courts. Note, Removal to Admiralty, 69 Yale L.J. 442 (1960). As our analysis of the merits of this case indicates, however, Suissa's right to bring a contractual action for wages was foreclosed by his earlier decision to follow the collective bargaining agreement's grievance procedures. Thus any claim which he had to judicial enforcement of his contractual rights derived from § 301. See, e. g., Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Such a claim states an independent ground of federal jurisdiction, and is consequently removable. 1A, Moore, Federal Practice ¶ 0.167 [3. —3] at 378–79 (1974). That Suissa may also have had a right to pursue an otherwise non-

removable claim for penalty wages under 46 U.S.C. § 596—a question which we do not decide—does not bar a federal court from entertaining the entire controversy, since 28 U.S.C. § 1441(c) specifically provides for removal of cases where removable and nonremovable claims are joined in one action. Cf. U.S. Industries v. Gregg, 348 F.Supp. 1004, 1014–1016 (D.Del.1972) (interpreting 15 U.S.C. § 77v(a)); Emery v. Chicago, B. & Q. R.R., 119 F.Supp. 654 (S.D.Iowa 1954) (interpreting 28 U.S.C. § 1445(a)). See also Cunningham v. Bethlehem Steel Co., 231 F.Supp. 934 (S.D.N.Y.1964) (removal of admiralty claims), criticized on other grounds in 1A Moore, supra, ¶ 0.163 [4.—7] at p. 287 n.15.

8. Judge Ward also found that Suissa was precluded from claiming a statutory penalty under § 596 by his initial election to follow grievance procedures.

fore any redress may be sought in court.[9] The reason for the unique departure from the established rule lay not in mistrust of the collective bargaining agent's ability fairly and reliably to dispose of wage claims, but rather in the policy which for nearly two hundred years § 596. and its predecessors, see Act of July 20, 1790, § 6, 1 Stat. 133, had been designed to effectuate. "[T]he evident purpose of the section," the Court had long ago held, is "to secure prompt payment of seamen's wages . . . and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." Collie v. Fergusson, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930). It was the Court's objective to give full measure to this established purpose, see Arguelles, 400 U.S. at 356, 365, 91 S.Ct. 409. Thus the Court resolved the "literal conflict" between § 596 and § 301 by allowing a seaman the option of choosing either route to enforce his claim. Id. at 356, 91 S.Ct. 409.

■ Quite different considerations prevail, however, once the remedy provided by the collective bargaining agreement has been pursued. Ordinarily, in such circumstances, settlement of a grievance by the union and the employer is binding upon the individual employee, absent evidence that the union has acted in bad faith in carrying out its duty of full and fair representation. Vaca v. Sipes, 386 U.S. 171, 190–192, 196, 87 S.Ct. 903, 17 L.Ed.2d 842 (White, J.) and 203–205, 87 S.Ct. 903 (Black, J., dissenting) (1967); Union News Co. v. Hildreth, 295 F.2d 658 (6th Cir. 1961). Nor do we think that a different rule should obtain for wage claims envisioned by § 596. For it is no longer realistic to suppose that a judicial determination is necessary for the most expeditious resolution of maritime wage claims—the very principle upon which Arguelles was based— once such grievances have been processed to settlement through the contractually established machinery.

Moreover, we are mindful that the interests which ordinarily make desirable the finality of settlements through the grievance process, apply with equal force in the field of admiralty. Employers would have little interest in agreeing to the incorporation of provisions for grievance settlement in the collective bargaining agreement, if pursuit of those processes would only be an unnecessary prelude to defense of a later court action. Perhaps even more important are the union's interests in affording quick and inexpensive protection to those it represents, and in participating in interpretations of the collective bargaining agreement to which it is a party. Maddox, supra, 379 U.S. at 656, 85 S.Ct. 614. The claims made by Suissa offer a concrete illustration of how significant those concerns can be. For with the exception of two hours which he claimed actually to have worked, his right to all the overtime which this suit seeks to collect is based upon two contractual provisions whose construction in light of the facts before us would affect all the Exford electricians represented by NMU.[10] To allow every disappointed employee to seek a de novo judicial determination of those provisions, without a showing of bad faith on the part of the Union,

---

**9.** The other striking exception to the exhaustion requirement, until recently, was the grievance and arbitration procedure set forth in the Railway Labor Act, 44 Stat. 579, as amended, 48 Stat. 1191, 80 Stat. 208, 45 U.S.C. § 153 First (i), Second (1970). Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941); Walker v. Southern R. Co., 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966). Moore was overruled, however, in Andrews v. Louisville & Nashville R. Co., 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972).

**10.** According to the interpretation argued for here by Suissa, those provisions, see p. [1344] and note 1 supra, would have allowed recovery by all the Exford electricians for full cargo working time, as well as for pro rata shares of the work usurped by the chief, and first and second engineers.

would greatly diminish NMU's position as exclusive bargaining representative. Employers would have little reason to rely upon terms of settlement proposed by the Union if the finality of any arrangement were subject only to the whims of affected employees. And the employees themselves, their bargaining agent unable to command employer respect, would be deprived of a channel of redress which *Arguelles* recognized at least as the equal of the courts in securing the prompt payment of wages. *Cf.* Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601, 657 (1956).

 It is true that the decision in *Arguelles* necessarily undercuts the union's importance to an extent, by providing an option of initial resort to the courts. But that is little justification for penalizing those organizations whose representation has been effective enough to be preferred in the first instance to judicial action. To hold that settlement via the method envisioned by the collective bargaining agreement is not only optional, but unenforceable even when invoked, would go far toward stripping the union of its role in administering, as well as negotiating, contractual terms. Consequently we hold that once a seaman has pursued his wage claim to settlement through the established grievance procedures, he is no longer free to seek the judicial recovery contemplated by § 596.[11]

### PENALTY UNDER § 596

██ In addition to 453½ hours of unpaid wages, Suissa claims a right to recover the statutory penalty for nonpayment provided by 46 U.S.C. § 596 (1970). That section provides that seamen—like Suissa—on vessels making foreign voyages shall be paid within four days of their discharge, or within 24 hours after the cargo has been discharged, whichever occurs first. An owner thereafter refusing payment without sufficient cause is liable for a sum equal to two days' pay for each day during which payment is delayed, "which sum shall be recoverable as wages in any claim made before the court . . . ." Whether a claim for the statutory penalty must be presented along with the wage claim when a seaman elects the contractual grievance procedures,[12] is a question which we need not decide in this case. For we find that in any event AEL's refusal to pay the full amount sought by Suissa was not without sufficient cause.

It is undisputed that on February 13, 1973, the day Suissa was discharged and paid for his work aboard the Exford, an adjustment was made of his grievance by the local representatives of the Union and AEL. Thus even before any penalty wages could have begun to accrue, American Export had offered to pay Suissa an amount which NMU, as his representative, found acceptable in satisfaction of his claim. Although Patrolman LaForgia thereafter referred the settlement to the National Office, which demanded a larger sum, there was no allegation that AEL did not immediately agree to payment for 86 hours, and reimbursement was promptly made to Suissa at the Payroll Office. We conclude that the company's willingness, within the statutory period and at all times thereafter, to pay Suissa the amount to which

11. Of course, as the district court properly indicated, allegations sufficient to ground a claim that NMU breached its duty of full and fair representation would enable Suissa to proceed against AEL under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970). The only allegation made below was the Union's failure to take Suissa's grievance to arbitration. Particularly where the NMU exercised its right to refer the dispute to the National Office, however, a procedure which the agreement explicitly provided should be used sparingly, *see* note 2 *supra*, such a bare charge is insufficient to establish a breach of the duty of fair representation. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

12. *See* U.S. Bulk Carriers v. Arguelles, 400 U.S. 351, 374–375, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971) (White, J., dissenting).

the NMU felt he was properly entitled under the contract, particularly in the absence of facts sufficient to support a claim of bad faith on the part of the Union, absolves it from liability under the penalty clause in § 596.[13]

---

**13.** We see no merit to Suissa's other claim, that the summary judgment was based on hearsay testimony in the affidavit of Albert Fialcowitz. There was ample evidence in Suissa's affidavit, the undisputed facts in the affidavit of Fialcowitz, and the exhibits below to support Judge Ward's decision that Suissa was not entitled to relief under § 301.